Mr. Chief Justice TANEY
delivered die opinion of the court.
The-question in this case is, whether the state of .Pennsylvania can lawfully impose a toll on carriages employed in transporting the ■ mail of the United States over that part of the Cumberland road which passes through the territory of that state?
*163 The dispute has arisen from an act of the legislature of Pennsylvania, passed in 1836, wnereby wagons, carriages', stages, and other modes of conveyance, carrying the United States mail, with passengers or the goods of other persons, are charged with half the toll levied upon other vehicles of the like description. The plaintiff in error is tíre commissioner and superintendent of the road, appointed by the state. The defendants are contractors, for carrying the' mail,- and they insist that their carriages,' when engaged in this service, aré entitled to pass along the road free from, toll, although they are' conveying passengers and their baggage at the same time. ' -In order to obtain the opinión of this court upon, the subject, an afnicable action was instituted by the 'plaintiff in the Circuit Court of the United States for .the western district of Pennsylvania, for the tolls directed to be collected by the law- above mentioned, and ■ the facts in the case stated by consent. The judgment óf the Circuit Court was against the' plaintiff, and it is now brought here for revision by writ of error.
The Cumberland road has been so often-the subject of public discussion,, and the ■ circumstances under which it-was’constructed and afterwards surrendered to the several state.?'through which it. passes, are so generally known, that we shall forbear to state-them further than may be necessary for the purpose - of. showing the' character of the present controversy ¿ and'explaining the principles upon which .the opinion -of' this court is founded.
The road in question is the principal, line off communication between the seat of government and the great valley of the Mississippi. It passes through Maryland,. Pennsylvania, Virginia, and Ohio,.and was constructed at an immense expense'by the United States, under the authority of different and .successive acts of Con-.' gress’: the states contributing nothing either to the máking of the road'of to the purchase of land over which it passes. They'did' nothing inore than enact laws authorizing the United. States to construct the'road within their respective limits, and to obtain the land •necessary for that purpose from the individual proprietors upon the payment of its value'.
‘ After the ro.ad 'had thus been made — although it was constructed with the utmost’cáre, sparing'no efforts to make it durable — it was .still found to be incapable of withstanding the' wear and tear produced by the number of carriages continually passing .over it, engaged in transporting passengers, or heavily laden- with agricultural produce or merchandise; and that either a very great expénse must •be annually incurred in repairs, of the road, in a short time, would be entirely broken up and become unfit for use. As no permanent provision had been made for these repairs, applications were made to Congress for the necessary funds; and as these demands upon the public treasury unavoidably increased, as the road was extended or longer in use, they naturally produced a strong feeling of dissat- *164 isfaetion and.opposition in those portions of the union which had no immediate' interest in the road; and- the constitutional power of .Congress to make these appropriations was also earnestly, and upon many applications, contested by many of the eminent statesmen of the country. It therefore became evident," that unless some, other means than appropriations from the public treasury could be devised, a work which every one felt to be a great public convenience, in which a large, portion of'the unión was directly and deeply interested, and. which had been constructed at so much cost, must soon become a total ruin.
' In this condition of things, the state of Ohio, on the 4th of February, 1831, passed an act, proposing, with the assent of Congress, to take under its care immediately the portion of the road within its limits which was then finished, and the residue from time to time as different parts of it should be ■ completed, and to erect toll gates thereon^. and to apply the tolls to. the repair and preservation of the road, specifying in .the law the tolls it proposed to demand, and con- ’ taining a proviso in relation to the property of the United.States, and to persons in its service, in the following words: “That no toll shall be received or collected for' the' passage of any stage or coach conveying the United States mail, or horses bearing the same; or any wagon or carriage laden with the property of the United States, .or aiiy cavalry or other troops, arms, or military stores, belonging to the same, or to any of the states comprising this union, or any .person or persons on duty in the military service of the United, States, or of the militia of .any of the states.” • On the 2d of March, in the same year, Congress passed a law assenting to this act of Ohio, which is recited at-'' large in the act of Congress, with all its provisions' and stipulations. .
The measure proposed by the state of. Ohio seems to' have been' received with general approbation; and on the 4th of April, 1831, Pennsylvania, about twp months after the passage of the law of Ohio, passed an,act similar in its principles, but varying from it in some respects on account of-the different condition of the road in the two states. In Ohio it.was new and unworn, and therefore needed no repair; while in' Pennsylvania, where it had been in use for several years, it Was in a state of great dilapidation. While proposing, therefore, to take it under the care of the state, and to charge, the tolls specified in the act, it.annexed a condition that the United States should first put iso much of it as- passed through that state in good repair, and an appropriation be also made by Congress for erecting toll-houses and toll-gates upon it. The clause in relation to the passage of the property of the United States over the road;’also varies from the language of the, Ohio law, and is in the following words: “ That no toll shall be received or collected for the passage of any wagon, or carriage laden with the property of *165 the United States, or any cannon or military stores belonging to the United States, or. to any of the states composing this union.”
The example of Pennsylvania was followed by Maryland and Virginia,-at-the next succeeding sessions of .their respective legislatures : the law-of Maryland being passed on the 23d of January, 1832, and the Virginia law on the 7th of February following. The proviso in relation to the property of the • United 'States, in the Maryland act, is precisely the same with that-of Pennsylvania, arid would seem to.have been copied from it, while the proviso in the Virginia law, upon this subject, follows almost literally the law of Ohio.
With -these several acts of Assembly before them, Congress, on.. the 3d of July, 1832, passed a law declaring the assent of the United States to the laws of Pennsylvania and Maryland, to remain in force during the pleasure of Congress; and the sum of $150,000 was appropriated to repair the.road east of the Ohio river, and to riaake the other needful improvements required by the laws of these, two states. No mention is made of Virginia in this,act of Congress, because in her law the previous reparation of the road, and the erection of toll-houses and gates, at the expense of the United States, was not in express terms made the condition upon which ’ she accepted the surrender of the road; but the assent-of Congress was' afterwards given to her law by the act of March 2d, 1833, which, like the contract with the two other states, was to remain in force during-the pleasure of'Congress!
The sum appropriated, as above mentioned, was, however, found insufficient for the purposes for which it was intended, and by an act of June 24th, 1834,-the further sum of $300,000 was appropriated ; and this act states the appropriation to be made for the, entire completion of the road east 6f the Ohio,- and other needfiil improvements, to carry into effect the laws of Pennsylvania, Maryland, and Virginia', each, of which is particularly referred to in the act of Congress; and 'further directs that as far as that sum is. expended, or so much of it as shall be necessary, the road should be surrendered to the states respectively through which it- passed. But so greatly had the rqad-become dilapidated, that even these large suriis were found inadequate to place it in a proper condition, ana by the act.of March 3d, 1835, the further sum of $346,188-^3-, was appropriated; but this law directed that no part ofi it should be paid or expended until the three states should respectively accept' the surrender; and that the United States “should not thereafter be subject to any expense, in relation to the said road.” • Under this act of Congress the surrender was accordingly-accepted, im.1835, and thé money applied as directed by the’act of Congress, and from that time the road has been in the. possession of and under the'Control of the several states, with toll-gates upon it. This is ihe history of the road, and of the legislation of Congress and the states *166 upon that subject, (so far as it is necessary now to state it,) up to the time when the road passed into 'the bands of the states. We shall have occasion hereafter to speak more particularly of the act of Congress last mentioned, because it is the act under which the states finally took possession of the road.'
When the new arrangement first w-ent into operation no toll was charged in any of the states upon carriages transporting the mail of the United States; and no toll upon such carriages, has ever yet'been claimed in Ohio, Maryland, or Virginia. But on the- 13th of June, 1836, the state of Pennsylvania..passed a law, declaring that carriages, &c.,- carrying the property of the United States or of a state, which were exempted from the payment of toll by the act of-1831, should thereafter be exempted- only in proportion to the amount of property in such parriage belonging to the United States dr a state, and, “ that in all cases of wagons,' carriages, stages, or other modes of conveyance, carrying the United States mail, With- passengers or goods, such wagon, stage, or other mode of conveyance shall pay half-toll upon such modes of conveyancé.” • 'And we. are now to inquire whether this half-toll can be imposed upon carriages carrying the. mail- under the compact between the United States and Pennsylvania. •
¡ " It will, be seen from this statement, that the constitutional power of. the general government to construct this road is not involved in the case before us; nor is this court called upon to express any opi-' nio.n upon -that subject; nor to inquire what were thé'rights of the United States in the road previous to the compacts hereinbefore mentioned. The road had in fact been made at the- expense ’of the general government. It w-Us the great line of connection between the seat of government and the Western states and territories, affording a convenient and safe channel for-the conveyance of the mails,- and enabling the government thereby to communicate more promptly vtith. its- numerous officers and agents in that part of the United-States west of the Alleghany mountains; The. object of the compacts was to preserve, the road for the purposes for which it had been made.- The right-of the several states to enter into these agreements will hardly be'questioned .by any one. A state may undoubtedly grant to an-individual or a corporation a right of way-through its territory upon such terms and conditions as it thinks proper; and we see no reason why it may not deal m like manner with the United , States, when -the latter have the porver to enter into the contract. Neither do we see any just ground for questioning the power of Congress. The "Constitution gives'1 it the power to establish post-offices and posfroads; and charged, as it thus is, with the transportation of the mails, it would hardly have performed its duty to the country, if it had suffered this, important line of communication to fell into utter rain, and sought out, as it-must have done, some circuitous or tardy and difficulffroute, when by the, immediate payment *167 of an equivalent it obtained in .perpetuity the means -of performing efficiently a great public duty, which the Constitution has imposed, upon the general government. Large- as the sum was which it paid for repairs, it was evidently a wise economy to make the expenditure. It secured .this convenient and important road- for its mails, where the cost of t> ansporting them is comparatively moderate, instead of being compelled to incur a far heavier annual- expense, as they must have done, if, % the destruction of this road-, they had been forced upon routes more circuitous or difficult, when much' higher charges must have been demanded by the contractors. Certainly, neither Ohio, nor Pennsylvania,- nor Maryland, nor Virginia, appear from their -laws to have doubted, their own power or the power of Congress. But we do not understand, ’that Pennsylvania now upon any ground disputes the validity of the compact or denies her obligation to perform it; on the contrary, she asserts her readiness to fulfil it in all its' parts, according to its true meaning; but denies the construction placed upon it by the United States. It is to that part of die case, therefore, that it becomes the duty, of -the court to turn its particular attention.
It is true, that in the law of Pennsylvania, -and of Maryland also, assented to by Congress, the exemption of carriages engaged in carrying the mail is not so clearly and specifically provided- for as in the laws of Ohio and Virginia. But in interpreting these contracts the character of the parties, the relation in which they stand to one another, and the objects they evidently had in view, must all be considered. ' And wp should hardly carry -out their true meaning and intention if w7e treated the contract as one between, individuals, bargaining wdth each other with adverse interests, and should apply to it the same strict and technical rules of construction that are appropriate to cases of that description. This, on the contrary, is a contract between two governments deeply concerned in the welfare of each other'; whose dearest interests and' happiness are closely and inseparably bound up together, and where an injury to one cannot fail-to be felt by the other. Pennsylvania, most undoubtedly,’was anxious to give to the general government every aid and facility, in its power, consistent with justice to-its own citizens, arid the government of the -United States was actuated by a like spirit.
This was the character of the parties and the relation in which they stood. -Besides, a considerable number of the citizens of the state ha'd a direct interest in the preservation of the road; and the state had manifested its sense of the importance of the work by the act of Assembly of 1807, which authorized'the construction of the road within its limits; and again in the resolution passed in 1828, by which it proposed to confer upon Congress the power of erecting gates and charging toll. ’' Yet the only value of. this road to the general government worth- considering is for the transportation of the- mails; and in ¡that point of view it is far more important than *168 any other pest-road in' the union. Occasionally, indeed, arms, or' military stores may be transported over it; and sometimes a portion . of the military force may pass along it. But these occasions for its' use, especially in time of peace, but' rarely occur; the daily and necessary use of the road by the United States is as a post-road, forming ail almost indispensable'link in the chain of communication from the seat of government to its western'bordeis.
Now, as this was well known to the parties, can it be supposed that when Pennsylvania, by her act of 1831, proposed to take the road, and keep it .in repair from the tolls collected upon it, and .exempted from toll carriages laden with the property of the United' States, she yet intended to charge it upon the mails ? That in re- ■ turn for the large' expenditure she required to be made, before she' would receive the road, she confined her exemption to matters of no importance,, and reserved the right to tax all that was of real value ? And when Congress assented to.the proposition, and incurred, such, heavy expenses for repairs, did they mean to leave their mails through Maryland and Pennsylvania still liable to the toll out of which the road was to be kept in repair ? Upon this point the act of Congress of March 3d, 1835, is entitled to great consideration. For it was under this law that the states finally took possession of the road and proceeded to collect the tolls. By so doing they assented to all the provisions contained in this act of Congress; and one of them is an express condition, that the United States should not thereafter be subject to. any expense in' relation to the road. Yet. under the argument, the expenses of the road are to be defrayed opt of the tolls. ■ collected upon it. And if the mails in Pennsylvania and Maryland may be charged, it will be found, that instead of the entire exemp- ' tion, for which the United States so expressly stipulated, and to ■which Pennsylvania agreed, a very large proportion of the expenses of repair will be annually thrown upon them. We do not think that ■either party could have- intended, when the contract was made, to burden the United States in this indirect way for the cost of repairs. So far as the general government is concerned, it might as well be paid directly from the Treasury. For nobody, we suppose, will doubt that this toll, although in form it is paid by the contractors, is in fact paid by the Post-office Department. It is not a contingent expense, which may or may not be incurred, and about which a contractor may speculate; but a certain and fixed amount, for which-he must provide, and which, therefore, in his bid for the pontract, he must add'to the sum he would be otherwise willing to take. It is of no consequence -to the United States whether charges for repairs are cast upon it through its Treasury or Post-office Department. ' In either case it is not free from expense in relation to the road, according to the compact upon which it was surrendered to and accepted by the states. "
" Neither do-the words of the law of Pennsylvania of 1831 require *169 a different construction. The United States have unquestionably a property in thé mails. They are not mere common carriers, but a government, performing a high official duty in holding and- guards ing its own property as well as that of its citizens committed to its care; for a very large portion of the letters and packages conveyed on this road, especially during the session of Congress, consists of communications to or from the officers of the executive department, or members of the legislature, on public service or in relation to matters of public concern.' - Nor- can the word laden, be construed to mean fully laden, for that would in effect .destroy the whole value of.the exemption, and compel the United States to pay a toll even on its military stores and other, property, unless every wagon or carriage employed in transporting it was as heavily laden as it could conveniently bear. We think that a carriage, whenever it is carrying the mail, is laden with the property of the United States within the true meaning of the compact: and that the act of Congress of which we have spoken, and to which the state assented, must be taken in connection with, the state law of 1831 in expounding this agreement. Consequently, the half-toll imposed by the act of 1836 cannot be recovered. •
The acts of assembly of Ohio and Virginia have been relied on in the argument by the. plaintiff in error; and it has been urged that, inasmuch as the.laws, of these states, in so many words, exempt carriages carrying the mail of -the United States, the omission of these words in .the law in: question shows that Pennsylvania intended to reserve the right to charge them with toll. And it is moreover insisted that, as the law of Ohio which contains, this provision passed some time before the act of Pennsylvania,’ it ought to be presumed that the law of the latter was drawn and passed with á full knowledge of what had been done by the former, and that the stipulation .in favour of the mail was designedly and intentionally omitted, because the state of Pennsylvania meant to reserve the right to charge it.
The court think otherwise. Even if the law of Ohio is supposed to have been before the legislature of Pennsylvania, it does not by any. means follow that the omission of some of its words w.ould .justify the inference urged in the argument, where the words retained, by their fair construction,, convéy. the same meaning. Indeed, if it appeared that the Ohio law was in fact before the legislature of Pennsylvania when it framed its own act upon -the subject,.it would rather seem-to lead to a. contrary conclusion. For 'it cannot be supposed that in .the compact-which’ the United' States was about to form with -four'different states, and when the agreement with one'would’.have been of no value without the others, Pennsylvania would have desired or asked, for any. privileges to herself which were not extended to the other states, nor that she would be less anxious to give every facility in her power to the general *170 government when carrying out' ’through' her territory the important and necessary operations of the Post-office Department. Nor could she have supposed that Congress would give privileges to one state which were denied to others; and, after having done equal justice to all in the repair and preparation of the road wherever needed, make different contracts with the different states; and, while it bargained for the exemption of its mails in one or more of then!, consent to pay toll in another. The fact that they are- clearly and explicitly exempted from toll in Ohio and Virginia is a strong argument to show that it was intended to exempt them in all, and that the compacts with Pennsylvania and Maryland were understood and believed to mean the same thing; and tó accomplish’the same objects. And this conclusion is greatly strengthened by the fact that Maryland, where’ the words of the law. are-precisely the same with those of Pennsylvania, has never claimed the right to exact toll from carriages carrying the mail; nor did Pennsylvania claim it in the first instance, and they were always allowed to pass free-until the act of 1836. Indeed that law itself.appears to recognise the right of the mail'and other property of the United States to go free, and the imposition of only half-toll would seem to/imply that the state intended to reach other objects, and did not desire to lay the burden upon any thing that' properly belonged to the United States. And so-far as we "CcOT judgeffrom its legislation^ Pennsylvania has never to this day placed any other construction upon its compact than the one we have given, and has never desired to depart from it.'
If we -are right in this view of the subject, the’ error consists in the mode by which the state endeavoured to attain its object. ’ Unquestionably the exemption of carriages béaring the mail is no exemption of any other property conveyed in the same vehicle, nor of any person travelling in it, unless he is in the service of the United States, and passing along in pursuance of orders from the proper authority. Upon all other persons, although travelling in the mail-stage, and upon their baggage, or any other property, although conveyed in the same carriage with the mail, -the state of Pennsylvania may lawfully collect the same- toll that she charges ■either upon passengers or similar property in other vehicles. If the state had made this road herself, and had not entered into any compact upon the subject with the United States, she might undoubtedly have erected toll-gates thereon, and if the United States afterwards adopted it as a post-road, the carriages engaged in their service in transporting the .mail, or otherwise, would have been liable to pay the same charges that were imposed by the state on'other vehicles of the same kind. And as any rights which the United States might be supposed to have acquired in this road have been surrendered to the state, the power of the fatter is as extensive in collecting toll as if the road had been made by herself,.except *171 in so far as she is restricted by her compact; and that compact does nothing more than exempt the carriages laden with the property of the United States, and the persons and baggage of those who are engaged in their service! Toll may therefore be imposed upon every thing else in any manner passing over the road; restricting, however, the application of .the money collected to the repair of the road, and to the salaries and compensation of the persons employed by the state in that duty.
It has been -strongly pressed in the argument, that the1 construction placed upon the compact by the court would enable the contractors to drive every other line of stages from the road, by dividing, the mail-bags among a multitude of carriages, each of which would be entitled to pass toll free, while the rival carriages would be compelled- to pay it: And that by this means the contractors for carrying the mail would in effect obtain a monopoly in the conveyance of passengers throughout the entire length of the road, gréatly injurious to the public, by lessening .that disposition to accommodate which competition is sure to produce, and enhancing the cost of travelling beyond the limits of a fair compensation;
The answer to this argument is, that under the agreement they have made, according to its just import, the. United States cannot claim an exemption for -more, carriages than are, necessary for the safe, speedy, and convenient conveyance of the mail. And if measures such as are suggested were adopted by .the contractors, it would be a violátion of the compact. The postmaster-general has unquestionably the right to' designate not only the character and description - of the vehicle, in which the mail is to be carried, but also the number of carriages to be employed on eveiy post-road.' And it can scarcely, we think, be supposed, that any one filling that high office, and acting on behalf of the'United States, would suffer the true spirit and meaning of the contract with the state to be violated or evaded by any contractor acting under the authority of his department. But undoubtedly, if such a case should ever occur, the contract, according to its true construction, could be enforced by the state in the courts of justice; and every, carriage-beyond thenumber reasonably sufficient for the safe, speedy, and convenient transportation of. the mail would be liable to the toll-imposed upon similar vehicles owned by other individuals. 'In a case where'an error in the post might be So injurious to the public, it would certainly be necessary that the abuse should be clearly shown before the remedy was applied. But there can be no doubt, that the compact in question, in the case supposed, would not shield the contractor, and. upon a case properly made out and established, it would be the duty of a court of justice to enforce the payment of the fells. No such fact, however, appears or is suggested in the case before us, and the judgment of the Cits. cuit Court is .therefore affirmed.