UNITED STATES v. HAMBURG-AMERIKANISCHE PACKETFAHRT
ACTIEN GESELLSCHAFT.

(Circuit Court of Appeals, Second Circuit. January 13, 1914.)

No. 39.

SHIPPING (§ 207*)—LIMITATION OF LIABILITY—CLAIM OF UNITED STATES.

The primary purpose of the Limited Liability Acts in favor of shipowners (Rev. St. §§ 4283–4285 [U. S. Comp. St. 1901, pp. 2943, 2944], and Acts June 26, 1884, c. 121, § 18, 23 Stat. 57, as amended by Act June 19, 1886, c. 421, § 4, 24 Stat. 80 [U. S. Comp. St. 1901, p. 2945]) was the promotion of the general welfare of the nation by giving encouragement to capital to invest in the building and navigation of ships in accordance with the policy of other maritime nations, and, under the general principle that such statutes are binding on the sovereign, the acts apply to the government of the United States, which is bound, equally with other claimants, by a decree granting such limitation and enjoining the prosecution of actions against the shipowner.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 555, 643, 644; Dec. Dig. § 207.*

Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the United States against the Hamburg-Amerikanische Packetfahrt Actien Gesellschaft. Decree for defendant, and libelant appeals. Affirmed.

This is an appeal taken by the United States from a final decree of the United States District Court for the Southern District of New York dismissing a libel. The libel was filed to recover damages sustained by the United States as the result of the total loss of a number of sacks of both registered and ordinary mail, alleged to be of the value of approximately $50,000, which had been delivered at the port of New York about January 31, 1912, to the Steamship Alleghany, owned by the respondent, the Hamburg-Amerikanische Packetfahrt Actien Gesellschaft, a corporation organized under the laws of the Empire of Germany. On February 2, 1912, the Alleghany collided with a British steamship Pomaron, as a result of which the Alleghany sank and became a total loss, together with all her cargo, including the mail aforesaid. It was expressly admitted by the respondent that both vessels were at fault for the collision because of the negligence of those in charge of their navigation.

Prior to the commencement of the suit, and in February, 1912, the respondent, pursuant to the Revised Statutes of the United States, §§ 4283–4285, and the several acts and statutes amendatory thereof and supplemental thereto (U. S. Comp. St. 1901, pp. 2943, 2944), filed a petition in the District Court for the Southern District of New York for the limitation of its liability for the

loss resulting from said collision. On January 25, 1913, a decree was entered providing that all claims not already presented should be forever barred, and enjoining "all persons whosoever or corporations whatsoever" from instituting any suit in any country or jurisdiction against the Hamburg-American Line for loss growing out of the collision. As the United States had made no claim and commenced no suit within the period fixed by the court's decree, the respondent claims the decree is a bar to the prosecution of this suit.

Henry A. Wise, U. S. Atty., and Addison S. Pratt, Asst. U. S. Atty., both of New York City.

Haight, Sandford & Smith, of New York City, for appellee.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). By the common law both in England and in the United States the personal liability of the owner of a vessel for damages by collision was the same as in other cases of negligence, being limited only by the amount of the loss and by the owner's ability to respond. The Main v. Williams, 152 U. S. 122, 126, 14 Sup. Ct. 486, 38 L. Ed. 381. It appears, too, that the civil law and the general law maritime at first made no distinction in this respect in favor of shipowners. Emerigon, Contrats à la Grosse, c. 4, § 11. Mr. Justice Brown, one of the great admiralty judges of this country, in his opinion in The Main v. Williams, supra, makes the following valuable historical statement concerning the limitation of liability principle in cases of maritime loss:

"But, however the practice originated, it appears, by the end of the seventeenth century, to have become firmly established among the leading maritime nations of Europe, since the French Ordinance of 1681, which has served as a model for most of the modern maritime codes, declares that the owners of the ship shall be answerable for the acts of the master, but shall be discharged therefrom upon relinquishing the ship and freight. Bk. 2, tit. 8, art. 2. A similar provision in the Ordinance of Rotterdam of 1721 declared that the owners should not be answerable for any act of the master done without their order, any further than their part of the ship amounted to; and by other articles of the same ordinance it was provided that each part owner should be liable for the value of his own share. The French Ordinance of 1681 was carried, with slight change of phraseology, into the commercial code of France, and all the other maritime nations whose jurisprudence is founded upon the civil law. Code de Commerce (French) art. 216; German Mar. Code, art. 452; Code of the Netherlands, art. 321; Belgian Code, art. 216; Italian Code, art. 311; Russian Code, art. 649; Spanish Code, art. 621, 622; Portuguese Code, art. 1345; Brazilian Code, art. 494; Argentine Code, art. 1039; Chilian Code, art. 879."

Emerigon in his treatise of Contrats "à la Grosse," after stating that the owners of the ship are bound in solido by everything which the captain does in the course of the voyage for the promotion of the voyage, goes on to say that the action in solido "does not exist against the owners farther than according to the interest which they have in the body of the ship; hence if the ship perish, or if they abandon their interest, they are no longer liable for anything."

There thus existed a conflict between the maritime law of England and of the United States on the one hand and the maritime law which the states of continental Europe had for several centuries enforced.

In 1734 the British Parliament adopted a limited liability act (7 Geo. II, c. 15) which limited the liability of shipowners to the value

of the vessel and her freight money in cases where the master or the mariners, without the privity and knowledge of the owner, embezzled or made away with any gold, precious stones, or other goods or merchandise, or committed some other misconduct in connection therewith. The act was passed in pursuance of a petition presented by the merchants of London to the House of Commons, who were stirred thereto by the decision in Boucher v. Lawson, Hardw. 85, holding a shipowner liable for coin embezzled by the master after shipment. The preamble of the act is illuminating as to the motive and purpose of Parliament in its enactment. It reads:

"Whereas it is of the greatest consequence and importance to this kingdom to promote the increase of the number of ships and vessels, and to prevent any discouragement to merchants and others from being interested and concerned therein, and whereas it has been held that in many cases owners of ships or vessels are answerable for goods and merchandise shipped or put on board the same, although the said goods and merchandise, after the same have been so put on board, should be made away with by the masters or mariners of the said ships or vessels, without the knowledge or privity of the owner or owners, by means whereof merchants and others are greatly discouraged from adventuring their fortunes as owners of ships or vessels, which will necessarily tend to the prejudice of the trade and navigation of this kingdom."

In 1786 the Act of 26 Geo. III, c. 86, was passed amending the earlier act and extending the limitation of liability to cases of fire and to cases where the master or privies were not privy to the embezzlement. This was followed in 1813 by the Act of 53 Geo. III, c. 159, extending the limitation of liability to all cases of loss arising in any manner.

In the United States, Congress did not legislate upon the subject until 1851, when it enacted the limited liability act which has been incorporated into the Revised Statutes, §§ 4282 to 4290. This act has since been amended by the Acts of 1884, c. 121, § 18, 23 Stat. 53, 57, and Acts of 1886, c. 421, § 4, 24 Stat. 79, 80. The act provides, so far as it applies to the facts of this case, that the liability of the owner or owners of any vessel for any loss by collision shall in no case exceed the value of the interest of such owner or owners in such vessel and her freight then pending, and that, if the whole of the ship and her freight shall not be sufficient to make compensation to those who suffer the loss, they shall receive compensation in proportion to their respective losses. To this end it is provided that the owner or owners of the vessel may take appropriate proceedings in any court for the purpose of apportioning the compensation to be made to those suffering the loss. It is further provided that the owner or owners of the vessel are to transfer his or their interest in such vessel and freight for the benefit of the claimants to a trustee to be appointed by a court of competent jurisdiction to act as such trustee for the persons who may prove to be legally entitled thereto, after which transfer all claims and proceedings against the owner or owners shall cease.

The respondent has fully complied with the terms of the act; the proceedings to limit liability having been prosecuted to final decree in which it was provided that all who had not filed claims in the course of the proceeding should be forever barred and perpetually enjoined

from bringing and prosecuting any suits or proceedings whatever against this respondent.

The United States did not appear in the proceeding or file any claim, although the pendency of the proceeding was known to it. Notwithstanding the final decree enjoining all the world from prosecuting further proceedings against the respondent for losses occasioned by the sinking of the Alleghany, this libel was filed to recover $50,000 for the loss of the mail.

The United States claims such a property in the mails, whether registered or not, as to permit it to maintain the libel and to recover the full value of the mail matter lost, irrespective of its legal liability to the senders or addressees thereof for all or only a part of the value. In 1845, in Searight v. Stokes, 3 How. 151, 169 (11 L. Ed. 537), the Supreme Court held, in an opinion written by Chief Justice Taney, that "the United States have unquestionably a property in the mails." And in 1894 the doctrine was reasserted by the court in the case of In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092.

A railroad or a steamship company carrying the mails of the United States is not, in respect to such service, a common carrier but is a public agent of the United States employed in performing a governmental function. The transportation company in carrying the mails owes a duty to the government for a loss occasioned by the negligence of its servants. Whether or not it is under any obligation to the sender or the addressee of the mail is a question upon which we do not find it necessary to pass and concerning which we express no opinion. See Boston Ins. Co. v. Chicago, etc., R. R. Co., 118 Iowa, 423, 92 N. W. 88, 59 L. R. A. 796; German State Bank v. Minneapolis, etc., Ry. Co. (C. C.) 113 Fed. 414; Bankers' Mutual Casualty Co. v. Minneapolis, etc., Ry. Co., 117 Fed. 434, 54 C. C. A. 608, 65 L. R. A. 397. It seems to have been admitted by each party to this litigation that no liability exists on the part of the government to the senders or the addressees of the unregistered mail matter lost by the sinking of the ship. But under the acts of Congress and the postal regulations adopted thereunder, a liability on the part of the government has been created respecting registered mail matter. Authority for the registry of mail was first given in 1872, but the act then passed (Act June 8, 1872, c. 335, 17 Stat. 300) expressly provided that the Post Office Department or its revenue was not to be liable for the loss of any mail matter on account of its having been registered. In 1897, by virtue of an act then passed (Act Feb. 27, 1897, 29 Stat. 599, c. 340 [U. S. Comp. St. 1901, p. 2685]) and the postal regulations adopted thereunder, the Department for the first time assumed liability for the loss of first-class registered mail matter, but limited the amount to the value of each package, not exceeding $10 in any one case. In 1902 the limit of liability was increased, in the case of first-class registered mail, to the amount of $25. And in 1911 the privilege of liability was extended to third and fourth class registered matter. But the liability thus assumed related only to the domestic mail. Its liability in respect to foreign mail is governed by the provisions contained in the Universal Postal Convention concluded in 1906 between the United States and other nations, and the Parcels Post Conventions entered into by the

United States and most of the Central and South American countries.
Under these provisions no liability is assumed or imposed for unregistered mail and the liability of each country for the loss of registered mail is limited to the sum of 50 francs.

The Limited Liability Act was passed for the purpose of putting American shipping upon an equality with that of other maritime nations, and also because it was believed to be of great importance to the country that our maritime commerce should be encouraged and extended. Mr. Justice Bradley, in Norwich Co. v. Wright, 13 Wall. 104, 20 L. Ed. 585, in giving the reasons which led to the passage of the act, pointed out that:

"The great object of the law was to encourage shipbuilding and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. * * * The public interests require the investment of capital in shipbuilding, quite as much as in any of these enterprises."

The public benefit which was to be derived from the upbuilding of the shipping interests was the purpose of the act and the only proper justification for its enactment. It is most important that this fact be kept in mind in any attempt to construe the law.

That Congress has the power to grant the right of limitation of liability is not questioned and could not be. It exists under the constitutional power of Congress to regulate commerce. Providence, etc., Steamship Co. v. Hill Mfg. Co., 109 U. S. 578, 589, 3 Sup. Ct. 379, 617, 27 L. Ed. 1038; Lord v. Goodall Steamship Co., 102 U. S. 541, 26 L. Ed. 224. It exists also under the admiralty clause of the Constitution. Ex parte Garnett, 141 U. S. 1, 11 Sup. Ct. 840, 35 L. Ed. 631; Rounds v. Providence, etc., Steamship Co., 14 R. I. 344.

Congress also changed the maritime law of this country in other important particulars which need to be considered in this same connection. The law of the United States originally was that the shipowner could not by any contract with the shipper exempt himself from all liability for loss or damage to the cargo resulting from the negligence of his master and crew. Stipulations of this nature were regarded as contrary to the policy of the law of this country. In European countries, however, contracts exempting from liability were recognized and enforced. For precisely the same reasons which influenced Congress to enact the Limited Liability Act, that body was led in 1893 to pass the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445, 446 [U. S. Comp. St. 1901, p. 2946]). The third section of the act provides that, if the owner of the vessel exercises due diligence to make the vessel seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner, agent, or charterers, are to be held liable for losses resulting from errors or faults in navigation or in the management of the vessel nor are they to be held liable for losses arising from dangers of the sea, or acts of God, or public enemies, etc. It will be noticed that the act does not empower the shipowner to secure exemption by contract from liability, but it provides by positive and express enactment that he shall not be liable in certain particulars if he has exercised due diligence in the matters specified. It is also a material fact

that the statute refers in no way, either directly or indirectly, to the United States. It is also a material fact that the purpose of Congress in enacting both acts was the same, the upbuilding of the commercial prosperity of the nation.

The contention of the United States is that, as the government is not mentioned in the Limited Liability Act, it is entitled to maintain the libel and recover from the respondent the damages suffered by the loss of the mail due to the sinking of the vessel occasioned by the negligence of those in charge.

The contention of the respondent is that, conceding the negligence, it is released from liability because the contract of carriage was subject to and governed by the terms and provisions of the Limited Liability Act and the amendments thereto; the vessel being seaworthy and properly equipped.

The case turns solely on the question whether this act applies to the government of the United States. If it does, the libel was properly dismissed. If it does not, then an error was made by the court below and the decree should be reversed. The government bases its contention that it is not bound by these acts, upon the principle that the sovereign is not bound by the terms and provisions of general acts unless expressly mentioned therein.

Chitty, in his work on Prerogatives of the Crown, published in 1820, states, on page 385, the matter as follows:

"The general rule clearly is that, though the King may avail himself of the provisions of any acts of Parliament, he is not bound by such as do not particularly and expressly mention him. To this rule, however, there is a most important exception, namely, that the King is impliedly bound by statutes passed for the public good; the relief of the poor; the general advancement of learning, religion, and justice; or to prevent fraud, injury or wrong. * * * But acts of Parliament which would divest or abridge the King of his prerogatives, his interests or his remedies, in the slightest degree, do not in general extend to or bind the King unless there be express words to that effect. * * * And in mere indifferent statutes, directing that certain matters shall be performed as therein pointed out, the King is not thereby in many instances prevented from adopting a different course in pursuance of his prerogative."

Blackstone's statement is as follows:

"The King is not bound by any act of Parliament unless he be named therein by special and particular words. The most general words that can be devised ('any person or persons, bodies politic or corporate, etc.') affect him not in the least, if they may tend to restrain or diminish any of his rights or interests. * * * Yet, where an act of Parliament is expressly made for the preservation of public rights and the suppression of public wrongs and does not interfere with the established rights of the Crown, it is said to be binding as well upon the King as upon the subject; and likewise the King may take the benefit of any particular act, though he be not especially named."

In Professor Max Muller's Last Essays (First Series) p. 214, may be found the following interesting statement, which shows the antiquity of this principle of the maritime law:

"In some of the tablets published by Oppert & Menant (Documents juridiques de l'Assyrie, 1877, p. 19) we find the earliest legal provisions on commercial law and maritime insurance. The principle that, if the merchant is shipwrecked, the shareholders have no claim on his estate is clearly recognized."

"The same principle prevails in Roman law, which ordains ut merces ex ea

pecunia comparatæ * * * periculo creditoris navigent, and it is quite possible that Greek merchants may have adopted the principle that fœnus una cum mercatore periit from the Phœnicians, the Romans from the Greek."

An explanation of the principle is given by Alderson, B., delivering the judgment of the court in Attorney General v. Donaldson, 10 M. & W. 123, 124 (1842), where he said:

"It is inferred prima facie that the law made by the Crown, with the assent of the Lords and Commons, is made for subjects and not for the Crown. Wilson v. Barkley (1561–62) Plow. 223."

The Supreme Court of the United States mentioned the principle in United States v. Herron, 20 Wall. 251, 255 (22 L. Ed. 275), Mr. Justice Clifford saying:

"Where an act of Parliament is made for the public good, as for the advancement of religion and justice, or to prevent injury and wrong, the King is bound by such act, though not particularly named therein; but where a statute is general, and thereby any prerogative, right, title, or interest is divested or taken from the King, in such case the King is not bound, unless the statute is made to extend to him by express words."

But an exception is made in the case of statutes enacted for the public good. In such cases the sovereign is bound, though not named. In Beal's Cardinal Rules of Legal Interpretation, London (2d Ed.) 1908, p. 291, it is said:

"Where a statute is made for the public good, the advancement of religion and justice, and to prevent injury and wrong, the Crown shall be bound by such statute, though not particularly named therein."

The same exception is also announced in Maxwell on Interpretation of Statutes (4th Ed.) p. 209.

It is a cardinal rule of construction that every statute must be construed with reference to the object intended to be accomplished by it. In order to ascertain its object, courts consider the necessity of enactment, the defects in the law as it existed, and the remedy provided by the statute, and they are accustomed to give to the statute that construction which is best calculated to advance its object by suppressing the mischief and securing the benefits intended. We may therefore inquire as to the necessity for the enactment by the Congress of the Limited Liability Law and as to the object which it was intended to accomplish.

The spirit in which the act should be interpreted was well stated by Mr. Justice Bradley in Providence & New York Steamship Co. v. Hill Mfg. Co., 109 U. S. 578, 3 Sup. Ct. 379, 617, 27 L. Ed. 1038, where he said:

"In these provisions of the statute we have sketched in outline a scheme of laws and regulations for the benefit of the shipping interest, the value and importance of which to our maritime commerce can hardly be estimated. Nevertheless, the practical value of the law will largely depend on the manner in which it is administered. If the courts having the execution of it administer it in a spirit of fairness, with the view of giving to shipowners the full benefit of the immunities intended to be secured by it, the encouragement it will afford to commercial operations (as before stated) will be of the last importance; but if it is administered with a tight and grudging hand, construing every clause most unfavorably against the shipowner, and allowing as little as possible to operate in his favor, the law will hardly be worth the trouble of its enactment. Its value and efficiency will also be greatly dimin-

ished, if not entirely destroyed, by allowing its administration to be hampered and interfered with 'by various and conflicting jurisdictions."

In La Bourgogne, 210 U. S. 95, 120, 28 Sup. Ct. 664, 52 L. Ed. 973, the above statement of Mr. Justice Bradley was approvingly quoted by the present Chief Justice.

We have seen that the Congress in the enactment of the Limited Liability Act intended to bring the law of this country into conformity with the maritime law of Europe. If the principle were now to be ingrafted upon our law that the government is not bound by the provisions of the act, it would seem as though, in establishing such an exception, we should be departing from the principle applied in other countries and to that extent going contrary to the intention of the Congress. Our attention has not been called to the fact that any such exception has been made or asserted on behalf of any European state; certainly no such exception has been established in favor of the Crown under the English Limited Liability Act. In Lords of the Admiralty v. Temperley, 2 Pritch. Adm. Dig. 1339, in 1881 the Attorney General undertook to raise the question. But, when the time came to argue the point, he stated that the Lords of Admiralty had concluded that it would not be fitting, as they were constantly entering into contracts with shipowners that they, as against a shipowner who had contracted with them, should raise the question whether the Crown was bound by the act.

In The Zoe, 11 P. D. 72 (1886), the Crown applied to get its pro rata share of the fund in court. Other claimants contended that the Crown was not subject to the act, and was bound to leave the fund to them, and avail itself of its personal remedy against the shipowners. Butt, J., said, in granting participation to the Crown:

"I have some doubt whether the Crown is not bound to come in and claim pro rata with the other claimants against the fund, in court."

In The Winkfield (1902) Prob. 42, an action for loss of mail, the government came in with the other claimants. It appears, therefore, that in England, where the prerogative of the sovereign is far greater than it is in this country, the Crown does not claim exemption from the Limited Liability Act.

We also have seen that the primary purpose of Congress in the adoption of the act now under consideration was the promotion of the general welfare of the nation by giving encouragement to capital to invest in the building and navigating of ships so that the commerce of the United States might be developed. And we have also seen that the government is bound by laws enacted for the promotion of the public good. We conclude, therefore, that upon well-established principles the government should be bound by the Limited Liability Act enacted for the promotion of the general good. If the public purpose is clear, the legislative intention is not to be defeated by the fact that the immediate benefit may be private and individual. The character of the Limited Liability Act is not at all changed because the immediate benefit may accrue to private persons who own the ships. The controlling motive of the enactments was the general good of the country as a whole. And for this reason, in our opinion, the govern-

ment should be held bound by the act. We do not believe that the Congress intended to compel private individuals to make concessions they are required to make under these acts to promote the general welfare while reserving to itself exemption from any similar concession. To permit the government to enforce the full extent of its claims while denying the same right to private individuals would not only result in marked injustice of which the government should never be guilty, but it would serve to defeat the very ends and purposes of the legislation itself.

So, too, a distinction exists between ordinary statutes of limitation and the Limited Liability Act. Statutes of limitation are simply statutes of repose, the object of which is to suppress fraudulent and stale claims from springing up at great distances of time and surprising the parties or their representatives when all proper evidence is lost. The courts have said that such statutes are for the benefit and repose of individuals and not to secure general objects of policy and morals. See Quick v. Corlies, 39 N. J. Law, 11; Clark v. Augustine, 62 N. J. Eq. 689, 51 Atl. 68; State Trust Co. v. Sheldon, 68 Vt. 259, 35 Atl. 177. In that respect, therefore, they differ from the Limited Liability Act which was enacted to secure general objects of policy.

So in the tariff law the exemption of the government from the payment of duties does not rest, in this country, on the principle of prerogative. The explanation of it is that it would be a wholly unnecessary and entirely useless proceeding if the government were to be required to withdraw money from the treasury with one hand and immediately repay it into the treasury with the other. There can be no rational justification for any construction of a law which would require such a course to be pursued.

In United States v. Hoar, 2 Mason, 311, 314, Fed. Cas. No. 15,-373, as early as 1821, Mr. Justice Story repudiated the idea that the exemption of the government from the operation of statutes of limitation rested in the notion of the prerogative. He based it on the principle of the preservation of the public rights from loss by the negligence of public officers. And that idea was accepted by the Supreme Court in Fink v. O'Neil, 106 U. S. 281, 1 Sup. Ct. 325, 27 L. Ed. 196, where the court says the doctrine rests "not upon any notion of prerogative."

It seems to us that the true principle, so far as our state and national governments are concerned, was correctly stated by Mr. Justice Story in United States v. Hoar, supra, when he said:

"Where the government is not expressly or by necessary implication included, it ought to be clear from the nature of the mischiefs to be redressed, or the language used, that the government itself was in contemplation of the Legislature, before a court of law would be authorized to put such an interpretation upon any statute."

But in our judgment it is proper to hold that, because of the nature of the mischiefs to be redressed by the Limited Liability Act, the government of the United States is bound by the act. Any other construction would greatly diminish the value and efficiency of the act and largely defeat what we conceive to have been the intention of the lawmaking body of the nation. To hold otherwise would be to adminis-

ter "with a tight and grudging hand" so much deprecated by the Supreme Court.

We find ourselves in accord with the action taken in the court below and with the opinion rendered by the District Court in an analogous case, in the Matter of the Petition of Lloyd Italiano Societa di Navigazione, as Owner of the Steamship Florida, 212 Fed. 334.

The decree is therefore affirmed.

LACOMBE, Circuit Judge (concurring).   For the purposes of this action it may be assumed that the government is correct in the contention that it has such a property in the mails as would permit it to maintain suit for their loss.   I therefore have not found it necessary to look into that branch of the case and express no opinion thereon.   I concur with Judge ROGERS in his discussion of the main question in the case and in his conclusion that the Limited Liability Statutes apply to the government.   It seems to me that these acts were passed, not for the benefit of a class, but emphatically for the public good; for the good of the whole people.   The object was to put this country on a better basis by stimulating the growth of a mercantile marine, whereby this country could compete with other nations in the carrying trade, so that the resources of the country in time of peace would be increased, and a valuable naval reserve, such as other great sea powers possess, would be provided for any future time of trouble.   That one class in the community happens to be primarily benefited is an incident of such legislation, but it is an incident which, as it seems to me, should not be allowed to dwarf or obscure the main intent.