## THE MONTANA.[1]

## Ins. Co. of North America and others *v.* Liverpool & Great Western Steam Co. (Three Cases.)[1]

*(District Court, E. D. New York.* June 29, 1883.)

1. **STRANDING OF VESSEL—JURISDICTION—COMMON CARRIER—EXEMPTION IN BILL OF LADING FROM LIABILITY FOR NEGLIGENCE.**

    The British steam-ship M. was stranded in Church bay, on the coast of Wales, while on a voyage from New York to Liverpool. Insurers, who had paid losses on goods which were on board, filed libels against the owners of the steam-ship *in personam*, to recover the amount so paid by them, averring that the steamer was stranded by negligence of the master of the steamer. The bills of lading contained a clause exempting the owners of the steamer from a loss by stranding, even though caused by negligence of the master. *Held,* that the liability of the respondents must be determined by the law of the United States; that, under the case of *Railroad Co.* v. *Lockwood,* 17 Wall. 357, in the supreme court of the United States, as well as other cases in the circuit and district courts, the provision in the bills of lading exempting the ship-owners from the consequences of the negligence of the master was null and void; that the libelants were entitled by subrogation to the rights of the owners of the goods; and that the case, therefore, must be determined by the question whether there was negligence which caused the stranding.

2. **SAME—NEGLIGENCE IN NAVIGATION—BURDEN OF PROOF—SUBROGATION OF INSURERS.**

    The facts on which the question of negligence turned were substantially as follows: The steamer went ashore about 2:45 A. M. in a dense fog, and the shore was not seen in time to stop the vessel. The master and his officers, who were on the bridge, averred that the fog was a fog on the land only, and that, till within a few minutes before the vessel struck, it had been a fine, clear night, and they had no idea of there being a fog. The master claimed that he had passed Tuskar light, on the coast of Ireland, the evening before, about four miles off, as usual, with a flood tide; that the vessel was kept on the usual course of N. 42 deg. E. up the channel; that he next made South Arklow light, on the coast of Ireland, which showed him that the flood tide was carrying his vessel more than usual over towards the Irish coast; that the next light to be made was the South Stack light, on the coast of Wales; that instead of making that light bearing, E. N. E., he made it S. E. by E., a point forward of his vessel's beam; that he judged the flood tide had carried her so far over towards the Irish coast that she was 15 miles from that light; that he had that light in sight an hour, and then lost sight of it a point off his vessel's beam; that as the light on the Skerries (which is a light about 8 miles N. 42 deg. E. from the South Stack) was not then visible, he changed his course to E. ¾ S., and ran on that course for five minutes, when he heard a gun, which he knew to be the fog-gun on the North Stack, about two miles from the South Stack, and he thought it sounded from four to six points abaft his starboard beam, whereupon he resumed his original course of N. 42 deg. E., and 15 minutes thereafter the vessel went ashore. *Held—*

    That, inasmuch as the bills of lading contained an exemption from loss caused by stranding, the burden was on the libelants to prove that the stranding was caused by negligence of the master.

    That although doubt was thrown upon the master's evidence that he had no suspicion of fog, by the fact proved that the lookouts on his vessel were doubled and the whistle blown; also upon his statement that he ran his vessel at half speed, by the evidence of the engineer in charge that the engines were run at full speed until just as the steamer struck,—still the case would be determined on the story told by the master himself.

    That from the place where the steamer struck it was manifest that the

[1] Reported by R. D. & Wyllys Benedict, of the New York bar.

steamer could not have been run upon her course of E. ¾ S. for only five minutes, as the master said, for in order to do that she would have had to run over the land; that if the master did not note the time of his running on that course, directly towards a dangerous coast, under the circumstances he was guilty of gross negligence, and if he did note it, it was incumbent on him to have stated it correctly.

That the result showed that the vessel, instead of being 15 miles off the South Stack light, passed it close at hand, and the master conceded that he must have done so; that his story, therefore, of having had that light in sight an hour, and changing its bearing only two points while running at the rate of 14 miles an hour, could not be true.

That at the point where the master said he supposed he was when he lost the South Stack light, the light on the Skerries would have been visible, as was shown by the chart, and that the fact that he did not see the light on the Skerries should have told him that there was a fog; and that this fact should have raised a doubt in his mind as to the correctness of his opinion that his vessel had been carried over towards the Irish coast, and he should have heaved the lead, which would have told him where he was.

That when the master heard the gun on the North Stack he was, as the result shows, east of it and in Holyhead bay, and if he knew that he was so, it was gross negligence to take a course N. 42 deg. E.; and that he did know it, was fixed by his own repeated statement that, with his vessel heading E. ¾ S., he heard the gun abaft the beam, and knew it was the gun on the North Stack.

That the stranding was, therefore, due to a want of reasonable care and skill in the navigation of the ship by the master, and the libelants must have a decree for the damages by them sustained.

In Admiralty.

*Butler, Stillman & Hubbard* and *R. D. Benedict*, for libelants.

*Beebe, Wilcox & Hobbs*, for claimant.

BENEDICT, J. These actions are to recover the value of goods shipped on the steam-ship Montana, in New York, to be transported therein to Liverpool, and destroyed by the stranding of the steamer at Church bay, on the Welsh coast, in March, 1880. The goods were insured by the several corporations—the Insurance Company of North America, the Phenix Insurance Company, and the Ulster Marine Insurance Company—who bring these suits, and the loss having been paid by the insurers, they now seek to recover of the owners of the steamer the amounts so paid by them respectively. Their claim rests upon the proposition that the stranding of the steamer, and consequent loss of the goods insured, was caused by the negligence of the master of the steamer, who was at the time responsible for her navigation.

On the part of the defendants the right of the libelants to recover is disputed upon several grounds:

*First*, it is said the facts proved do not make out a case where the insurers are subrogated to the rights of the owners of the goods, and therefore no recovery can be had in these actions. But, in my opinion, the testimony is clearly sufficient to bring these cases within the settled rule, and entitles the libelants to enforce against the owners of this steamer any right which accrued to the owners of the goods by reason of the bills of lading, and subsequent loss of the property shipped.

Next, it is said in behalf of the defendants that their liability upon these bills of lading must be determined by the law of England. But the undisputed facts show that there is no ground for such a contention.

Next, it is contended, and with much apparent earnestness, that the law of this country permits no recovery, because of the fact that the bills of lading sued on provide for exemption from liability for losses caused by the negligence of the defendant's servants. But this court is bound by authority to hold such a provision in the contract of a common carrier to be null and void. Upon this point the decision of the supreme court of the United States in *Railroad Co.* v. *Lockwood*, 17 Wall. 357, in my opinion controls the present case. The only distinction between *Railroad Co.* v. *Lockwood* and the present case is that here the contract is a bill of lading for goods shipped on a vessel, while the contract passed on in *Railroad Co.* v. *Lockwood* was for the transportation of a passenger, and by railroad. I am unable to see that this distinction creates a difference between the cases. The defendants here were common carriers, and the reasons for the rule declared by the supreme court in *Railroad Co.* v. *Lockwood*, appear to me to apply with full force to a contract for the carriage of goods in a ship. But if this court be not bound by the decision of the supreme court in the case referred to, it is controlled on this occasion by decisions, in cases precisely similar to the present, which have been made by this court, and by the circuit court in this circuit. See *The City of Norwich*, 3 Ben. 575; *Nelson* v. *National S. S. Co.* 7 Ben. 340; *The Colon*, 9 Ben. 354; *The Hindoo*, 1 Fed. Rep. 627; *The Powhatan*, 5 Fed. Rep. 375, and 12 Fed. Rep. 876. It would be a waste of time, therefore, to follow the elaborate argument that has been presented in regard to the effect to be given to the provisions of the bills of lading under which the goods in question were transported.

My decision of this case must turn, not upon any question as to the form of the contract, but upon a question of navigation, and I am required to say whether the stranding of this steamer was caused by a failure on the part of the master to use reasonable care and skill in the navigation of his ship.

The decision of this question may well be approached with solicitude, but it is not seen that it involves an inquiry different in character from the inquiry so often forced upon the attention of courts of admiralty in cases of collisions of ships.

Upon this inquiry I enter with the remark that, inasmuch as the bills of lading sued on contain an exemption from liability for loss caused by stranding, I consider the libelants bound to prove that the cause of the stranding was negligence of the master. It will not be sufficient to show an error of judgment on the part of the master, either in selecting one of two courses open to be pursued by him, or in coming to one rather than another of two conclusions possible

to be drawn from the facts as known, or as they ought to have been known by him. He must be proved to have displayed a want of reasonable care and skill in view of the facts as they appeared, or ought to have appeared, to him.

Moreover, the liability of the defendants will be determined upon the testimony of the master himself, who is produced as a witness by the defendants, and neither he nor they can complain if his statement of what was done, and the attending circumstances, be made the basis of my decree.

The master's statement is, in substance, as follows: That, bound up the Irish channel, when Tuskar light was about abeam some four miles away, he put the steamer upon a course N. 42 deg. E. On that course, South Arklow light, upon the Irish coast, ought not to have been seen, but was seen plainly. From this circumstance the master, as he says, judged that the flood tide then running was carrying him to west of his proper course; but, nevertheless, he made no change. He passed North Arklow light without seeing it, and made no other light until he made the South Stack light. This light, which should have been made when bearing E. N. E., and about 20 miles away, was made bearing S. E. by E., one point forward of his beam. That light, he says, he held in sight for an hour, during which time he ran at full speed, and without change of course; that at 1: 45 the light was abeam, and about 2 o'clock the bearing of the light had changed two points; and then the light was lost, bearing at the time one point abaft his beam. The master further says that the night was clear, and the South Stack light appeared to be dipping upon the horizon, from which circumstance he judged himself to be 15 miles away from it; and that, acting upon that assumption, when he lost the light, not having made the Skerries light, he changed his course from N. 42 deg. E. to E. ¾ S. On the latter course, he says, he ran five minutes at half speed, when, while running E. ¾ S., he heard the North Stack gun on his starboard quarter. He immediately altered the course of the steamer to N. 42 deg. E., and on that course ran slow for about 15 minutes, (the answer says about half an hour,) when the steamer brought up on the shore in Church bay, in a thick fog, without giving him time, after discovering the shore, to reverse his engines.

That this account as given by the master, and presented to the court for its consideration by the defendants, is untrue in important particulars, cannot be doubted.

The place where the steamer stranded is fixed. It is in Holyhead bay, east of the Skerries and east of the North Stack. If, as the master says, and as is not doubted, the steamer was running upon a course N. 42 deg. E., when the shore in Church bay was made ahead, it cannot be true, as the master and also the answer says, that he ran five minutes at slow speed upon the east course; for upon such a course she would not have cleared the South Stack, and would

have run over the land. No explanation of this statement of the master in regard to the length of time he held his easterly course has been given. He was running his vessel directly towards a dangerous coast. He was himself upon the bridge. His position was in doubt, and it is difficult to believe that he did not note the exact time of his running to the eastward. If he did note the time, it was incumbent upon him to state it truly, and he has not done so. If, under the circumstances, he ran E. ¾ S. without noting the time, he was guilty of gross negligence.

Again, the result leaves no room to doubt that the steamer, instead of passing the South Stack at a distance of 15 miles, as the master says he at the time supposed, in fact passed the South Stack close at hand. The master now concedes such to have been the fact. How, then, can the master's statement be accounted for, when he says in positive terms that he had the South Stack in sight about an hour; that he examined it with glasses and timed its revolutions; and that, while running for this hour at full speed on a course N. 42 deg. E., the bearing of the light changed but two points, namely, from one point abaft to one point forward of his beam? If he saw the South Stack light at all, he must have seen it close at hand, for the result proves that he passed it close at hand. If he had seen the light, as he says he did, he would have passed it some 20 miles away. If he never saw that light, why does he swear not only that he saw it, but examined it with a glass, and timed its revolutions by his watch, and knew at the time that it was the South Stack light, and observed that its bearing changed but two points while running an hour.

Still again, the master marks upon the chart the point at which he changed his course from N. 42 deg. E. to E. ¾ S., when, as he says, he lost the South Stack light. At that point the South Stack light and the Skerries light should have been in full view, as his chart told him, and he lost the South Stack without having made the Skerries light. Yet he says it was clear where he was, and it did not occur to him to consider that the lights might be obscured by fog. No explanation of this failure to know what the surrounding circumstances, as he narrates them, were proclaiming, namely, that there was fog on the shore, has been given. Nor has any modification of the testimony of the master been made, although the defendants have had time and opportunity to correct his testimony if they had desired.

Still again, when the master, according to his statement, lost the South Stack light, two conclusions were, perhaps, possible to be drawn from the fact: one, that he lost it because he had been carried so far to west by the tide; the other, that fog had shut out the light from him. Without using his lead, he acted upon the assumption that he was too far to the west, and so ran his vessel on shore. His excuse for not using the lead is that there was nothing in the circumstances to lead him to believe that he was near the east shore, or that the lead would disclose his true position; but the fact stated

by him, that he lost the South Stack light, and had not made the Skerries light, when both those lights should have been visible if he was where he supposed himself to be, should have raised a doubt as to the correctness of his assumption that he had been carried by the tide several miles to west of his true course, and made it incumbent on him, in the exercise of reasonable care, to heave the lead at the time he changed his course to east. He was bound to suppose it possible that he was mistaken as to his position, and equally possible that his failure to make the lights was because of a fog, and not because of distance from the Welsh coast. He was bound to know that the lead would tell him whether he was where he supposed himself to be, or near the Welsh coast, and the result shows that if the lead had been used it would have told him, and at once corrected his erroneous and unfounded assumption that he was 15 miles west of the South Stack light.

Still again, the master says that the weather was entirely clear about him, and he had no suspicion that fog was obscuring the lights until, when on the E. $\frac{3}{4}$ S. course, he heard the North Stack gun on his starboard quarter. But the fact that neither the South Stack light nor the Skerries light was visible to him while on the E. $\frac{3}{4}$ S. course was loudly proclaiming the presence of fog, and yet the master, according to his own statement, navigated his vessel up to the time of his hearing the North Stack gun as if there was no fog, and without any regard whatever to the warnings of fog plainly given by the circumstances as they are narrated by him.

It should, perhaps, be remarked here that doubt is cast upon the master's statement that he never thought of the presence of fog, by the fact proved by other witnesses for the steamer, that the lookouts were doubled and the whistle blown. As, also, doubt is cast upon his statement that he ran at half speed on the easterly course, and slow after again changing to N. 42 deg. E., by the testimony of the engineer that the engine went at full speed until just as the steamer struck. But I judge him by what he says, and he says most earnestly that he had no suspicion of the presence of fog about the lights until he heard the North Stack gun.

Lastly, the master says that while running E. $\frac{3}{4}$ S. he heard the North Stack gun; that he concluded from the sound that the gun was abaft his beam; that he at once changed his course from E. $\frac{3}{4}$ S. to N. 42 deg. E., and proceeded slow some 15 minutes until he brought up on the shore at Church bay.

The position of the North Stack is fixed, and the point where the vessel stranded is also fixed, and these positions show that when the master changed his course from E. $\frac{3}{4}$ S. to N. 42 deg. E., he was east of the North Stack gun, and in Holyhead bay. If the master, at the time he abandoned his easterly course, knew that he was east of the North Stack, and in Holyhead bay, it was a gross mistake in navigation for him to take and hold a course N. 42 deg. E., as he did

after hearing the gun; and we have his own word for the fact that at the time when, upon hearing the gun, he abandoned his easterly course for the course 42 deg. E., he knew that the North Stack was abaft his beam on the starboard quarter, as in fact it was.

Upon the master's showing, therefore, it is impossible to conclude otherwise than that he conspicuously failed to use reasonable care and skill in navigating his vessel upon hearing the North Stack gun, and that the loss in question was the immediate result of his negligence in that particular.

The only suggestion made in regard to this aspect of the case is that the master, when he heard the sound of the North Stack gun, could not have been sure of its bearing. But the difficulty with this suggestion is that the master repeatedly swears that when he heard the gun he knew that it was the North Stack gun, and that he did conclude that the gun was abaft his beam, as in fact it was. Upon the facts as they were, it was great negligence to take and hold a course N. 42 deg. E. after the North Stack gun was heard, and the master swears that he understood the facts to be as in truth they were. How is it possible, then, to absolve him from the charge of having run his ship ashore by failing to exercise reasonable care and skill in her navigation? It is to be remarked in this connection that the fact that the master, when he changed from E. ¾ S. to N. 42 deg. E., knew that he was in Holyhead bay, and east of the North Stack, is fixed beyond dispute by the statement in the defendant's answer, where it is said: "After running on such east course five minutes, a gun was heard on the starboard quarter."

My conclusion, therefore, is that the proofs show that the loss of the goods in question was caused, not by a mere error of judgment on the part of the master of the steamer Montana, but by a failure to exercise reasonable care and skill in the navigation of his ship.

The liability of the defendants follows, of course. Let decrees be entered in favor of the libelants, with an order of reference to ascertain the amount of the loss.