THE WILLDOMINO (two cases).*

CHARLES PFIZER & CO., Inc., v. CONVOY S. S. CO., Limited.

(Circuit Court of Appeals, Third Circuit. June 4, 1924. Rehearing Denied. July 26, 1924.)

Nos. 3036-3038.

1. **Shipping ☞120—Carrier is insurer in absence of special contract or statute limiting liability.**

A carrier of goods by water is an insurer, and, though no actual blame is imputable to it, is absolutely liable, in the absence of a special contract or statute limiting its liability for all damages sustained to the goods, unless the damage is occasioned by the act of God, the public enemy, the public authority, the fault of the shipper, or the inherent nature of the thing shipped.

2. **Shipping ☞141 (4)—Owner cannot contract against cargo loss caused by unseaworthiness arising from his lack of diligence.**

Under Harter Act, § 2 (Comp. St. § 8030), a shipowner may contract against liability for losses to cargo caused by unseaworthiness, provided he has used due diligence to make the vessel seaworthy, but cannot contract away such liability for unseaworthiness arising from his lack of diligence.

3. **Shipping ☞141 (4)—To entitle owner to exemption from liability for faults in navigation, he must prove due diligence to make the vessel seaworthy.**

Under Harter Act, § 3 (Comp. St. § 8031), to entitle a shipowner to exemption from liability for losses to cargo through fault or error in management or navigation of the vessel, he has the burden of proving that he exercised due diligence to make the vessel seaworthy and properly manned, equipped, and supplied, without regard to whether or not there was any causal connection between the lack of such diligence and the loss.

4. **Shipping ☞137—Exemption from liability depends on diligence in each stage of voyage.**

Where the voyage on which a shipment is made is not continuous, but divided into stages, the requirement of Harter Act, § 3 (Comp. St. § 8031), that the owner must have exercised due diligence to make the ship seaworthy to entitle him to exemption from liability for loss or damage caused by faults of management or navigation, applies at the beginning of each stage of the voyage.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari granted 266 U. S. —, 45 Sup. Ct. 98, 69 L. Ed. —.

**5. Shipping ⬥⟳141 (4)—Ship held "unseaworthy" because of insufficient coal supply at beginning of voyage.**

A steamship, which sailed from Lisbon for New York with less than the quantity of coal usually taken by vessels for that voyage, *held* "unseaworthy" as not properly equipped and supplied for the voyage, within the requirement of Harter Act, § 3 (Comp. St. § 8031), and not exempted from such requirement by a provision of the bill of lading giving her liberty to coal at any port or ports in or out of the way.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unseaworthy.]

**6. Shipping ⬥⟳132(3)—Burden of proving negligent stranding is on shipper.**

In a suit for damage to cargo caused by stranding of the vessel, the burden of proving that the stranding was due to negligence rests on the shipper.

**7. Shipping ⬥⟳124—Stranding of vessel held due to negligent navigation.**

The stranding of a steamship *held* due to negligent navigation, where she was proceeding in a fog along a dangerous coast with which the master was unfamiliar, and where he took but one sounding and the point of stranding was several miles off her supposed course.

**8. Shipping ⬥⟳130—Duty of ship to use reasonable diligence to protect cargo damaged by stranding from further injury.**

It is the duty of a carrier by sea to exercise reasonable care and diligence to protect cargo damaged by stranding from further damage so far as it can be done consistently with its duty to owners of other parts of the cargo.

**9. Admiralty ⬥⟳118—Issues not presented to trial court not considered by appellate court.**

Questions not presented to the trial court will not be considered by the appellate court.

**10. Shipping ⬥⟳125—Provisions of bill of lading allowing deviation must be restricted to business and necessities of ship on voyage contemplated.**

Provisions of a bill of lading permitting deviation by the ship, unless they expressly or by unavoidable implication provide otherwise, relate to and must be construed with reference to the voyage contemplated by the parties, and must be restricted to the business and necessities of the ship pertaining to that voyage, to be determined as a question of fact in each case.

**11. Shipping ⬥⟳132(5)—Steamship held to have deviated from voyage.**

Circumstantial evidence *held* to establish that the purpose of a steamship in going to the port of North Sydney, Nova Scotia, on a voyage from Lisbon to New York, which lengthened the voyage 300 miles, was to obtain bunker coal for a subsequent voyage, and that it was an unauthorized deviation which nullified the carrier's limitations of liability in its bills of lading.

**12. Shipping ⬥⟳145—Freight not recoverable where goods are not delivered in specie.**

Freight money is not recoverable, though the bill of lading calls for payment of freight "ship lost or not lost," where the goods are so damaged by the carrier's negligence that they cannot be delivered in specie.

Appeal from the District Court of the United States for the District of New Jersey; Charles F. Lynch, Judge.

Suits in admiralty by the Citro Chemical Company of America, and by Charles Pfizer & Co., Inc., against the steamship Willdomino, with cross-libel by the Convoy Steamship Company, Limited, claimant, against Charles Pfizer & Co., Limited. Decree dismissing both libels, and for claimant on its cross-libel, from which libelants appeal. Reversed and remanded, with directions.

Bigham, Englar & Jones, of New York City, and McDermott, Enright & Carpenter, of Jersey City, N. J. (D. Roger Englar, of New York City, and James D. Carpenter, of Jersey City, N. J., of counsel), for appellants.

Hunt, Hill & Betts, of New York City (George C. Sprague, George Whitefield Betts, Jr., and Joseph A. Barrett, all of New York City, of counsel), for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

MORRIS, District Judge. In June, 1920, the steamship Willdomino, lying at Messina, Italy, took on board for transportation to New York 503 casks of citrate of lime in good order and condition, of which Citro Chemical Company of America and Charles Pfizer & Company, Inc., were the owners and consignees of 168 and 335 casks, respectively. When delivery was tendered at New York, the merchandise was so damaged that the owners refused to receive it, abandoned it to the ship, and filed separate libels against the ship to recover their loss. Convoy Steamship Company, Limited, appeared as claimant, filed stipulations for value and a cross-libel against the Pfizer Company to recover for the 335 casks the freight money which, because of the damage, that company had refused to pay. The court below tried the cases together, dismissed the libels against the ship, and on the cross-libel entered a decree against the Pfizer Company for the amount of its freight money. An appeal to this court has been taken from each of those decrees.

After leaving Messina and before arriving at New York, the Willdomino put in at Gibraltar, Lisbon, Ponta Delgada in the Azores, North Sydney, Nova Scotia, and at Halifax. While proceeding from North Sydney to Halifax on July 24th, she struck a reef or submerged object and tore a large hole in her bow. Water entered and almost completely filled lower No. 1 hold, in which the citrate of lime was stowed. With some assistance from a salvage tug the vessel arrived at Halifax. After certain examinations had been there made and sand ballast put on the stern to raise the bow somewhat, she left Halifax in convoy of a tug and arrived in New York on August 7th. The cargo other than the citrate of lime was discharged. She then proceeded, August 25th, to dry dock for repairs. While repairs were under way, the steamer was shifted from dry dock to wet dock and back again several times. With each shift the water ran out of or into the hold in which libelants' goods were stowed. Repairs were completed on October 2d. Thereupon the citrate of lime was tendered to the consignees. It was then almost a total loss.

The decisive issues are those raised by the separate and distinct defenses set up in the answers of the claimant. The first of those defenses is that the damage, if any, to the merchandise of the libelants was due to one or more of the causes from the consequences of which the ship and carrier were made exempt by the bill of lading, which provides, in part:

"It is mutually agreed as follows: First. The ship and carrier shall not be liable for loss or damage occasioned by:

"The perils of the seas or other waters. * * *

"Unseaworthiness of the ship even existing at time of shipment or sailing on the voyage, provided the owners, have exercised due diligence to make the vessel seaworthy. * * *

"Collision, stranding, or other accidents of navigation of whatsoever kind, even when occasioned by the negligence, default or error in judgment of the pilot, master, mariners, or other servants of the shipowner. * * *

"Nor for any loss or damage occasioned by causes beyond his control. * * *"

The claimant asserts that those provisions are valid—some at common law and the remainder by virtue of section 2 of the Harter Act (Comp. St. § 8030).

The second affirmative defense is that the damage to the merchandise of the libelants was due to the stranding of the vessel; that the libelants have failed to establish that the stranding was due to negligent navigation, but that if they have so shown the claimant has proved that it (the claimant) exercised "due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied"; and that consequently the ship and the claimant are exempt from liability to the libelants by reason of the third section of the Harter Act (Comp. St. § 8031).

A third distinct defense is the stipulation of the bill of lading limiting liability to $100 per package, which reads thus:

"Third. The value of package receipted for as above does not exceed the sum of $100, unless otherwise stated herein, on which basis the rate of freight is adjusted."

The libelants contend that the stranding of the Willdomino was due to negligence in navigation, and that the stipulations in the bill of lading against liability for negligence were void and of no effect; that the owner of the vessel did not "exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied," in that, by direction of the owner, as libelants contend, she sailed from Gibralter, from Lisbon, and from Ponta Delgada without sufficient fuel, and that, consequently, the third section of the Harter Act is without application. The libelants likewise contend that the ship in going to Lisbon, to Ponta Delgada, and to North Sydney deviated from the voyage specified in the bills of lading, and that thereby the bill of lading clause limiting liability to $100 per cask and also all exemptions from liability created by law or contained in the bills of lading were nullified and the vessel made absolutely liable as at common law for the safe transportation and proper delivery of its cargo. The libelants further contend that even if damage to the goods was brought about by a cause from the effect of which the carrier was validly exempted, it was nevertheless the duty of the carrier to exercise reasonable care and diligence to protect the goods from further or additional damage, and this, it asserts, the carrier failed to do.

In the matter of the cross-libel against it for freight, the Pfizer Company asserts that at the time delivery of its consignment was tendered its goods had been so far damaged that they were no longer in specie, and that consequently it is without liability for freight.

[1] The Willdomino was a general ship engaged in the common carriage of merchandise for hire. A carrier of goods by water, like a carrier by land, is an insurer and, although no actual blame is imputable to it, is absolutely liable, in the absence of a special contract or statute limiting its liability, for all damage sustained by the goods intrusted to its care, unless the damage is occasioned by the act of God, the public enemy, the public authority, the fault of the shipper, or the inherent nature of the thing shipped. Clark v. Barnwell, 12 How. 272, 279, 13 L. Ed. 985; 24 R. C. L. 1312. The law however, recognized the right of the carrier to limit in many particulars its common-law liability by special agreement or stipulations in the bill of lading. But in America it was established that a common carrier by sea could not so exempt itself from liability to the owner of cargo for damage arising from the negligence of the master or crew of the vessel. The Jason, 225 U. S. 32, 49, 32 Sup. Ct. 560, 56 L. Ed. 969. To meet the ever increasing attempts further to limit the liability of the vessel and her owners by inserting in bills of lading stipulations against losses arising from unseaworthiness, bad stowage, negligence, and other causes of liability by which the common-law responsibility of carriers by sea was being frittered away the Harter Act[1] (27 Stat. 445; Comp. St. [1916]

[1] An act relating to navigation of vessels, bills of lading, and to certain obligations, duties, and rights in connection with the carriage of property.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that it shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect.

Sec. 2. That it shall not be lawful for any vessel transporting merchandise or property from or between ports of the United States of America and foreign ports, her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided.

Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service.

§§ 8029–8031) was passed. It was designed to fix the relations between the cargo and the vessel and to prohibit contracts restricting the liability of the vessel in certain particulars. The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771. By the first section of that act contractual clauses whereby the carrier "shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery" of any of the cargo are made null and void, while the last clause of the second section makes unlawful any agreement "whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided." These two sections, in their general purport, so far as respects the care and delivery of the cargo, are not essentially different. Calderon v. Atlas Steamship Co., 170 U. S. 272, 277, 18 Sup. Ct. 588, 42 L. Ed. 1033.

[2] The first remaining part of the second section of the act enables a vessel and its owner to obtain, by contract, relief from absolute liability for lack of seaworthiness, but not from the obligation "to exercise due diligence, properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage." By virtue of this section liability for losses to cargo caused by unseaworthiness may be contracted away provided the owner uses due diligence to make the vessel seaworthy, but liability for loss to cargo caused by unseaworthiness arising from lack of diligence on the part of the owner cannot be contracted away. The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65; The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181.

[3] By the third section of the Harter Act, Congress provided that if the owner of a vessel shall exercise due diligence in making his ship "in all respects seaworthy and properly manned, equipped, and supplied," neither the owner nor the ship shall be liable to the shipper for damage to cargo resulting from the navigation or management of the vessel, however faulty. The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130. This section, unlike section 2, is self-executing. United States v. Hamburg-Amerikanische, etc., Gesellschaft, 212 Fed. 40, 44, 128 C. C. A. 496, L. R. A. 1917C, 1103. Again section 2 deals with liability for damage caused by lack of seaworthiness, while section 3 deals with liability for damage caused by "faults or errors in navigation or in the management of said vessel." The burden is on the shipowner setting up exemption from liability under the third section of the act to prove that he exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied. The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65. In Int. Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 226, 21 Sup. Ct. 591, 594 (45 L. Ed. 830), the Supreme Court said:

"* * * Even if the loss occur through fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised, and it is for the owner to establish the existence of one or the other of these conditions."

It follows, we think, that if the carrier fails to meet that burden he is liable for damage to the cargo resulting from negligence of the master and crew in the navigation or management of the vessel, and the carrier is so liable wholly without regard to whether or not there was any causal connection between the lack of due diligence to make the ship seaworthy in all respects and the loss caused by the negligence in navigation or in the management of the vessel.

How stand the cases at bar when measured by the foregoing principles of law? The first affirmative defense is exemption from liability by reason of the stipulations in the bills of lading. Of these stipulations the most pertinent, in our view, are: (1) That pertaining to the unseaworthiness of the ship ; and (2) that pertaining to negligence in the navigation or management of the vessel. We think the former was authorized by section 2 of the Harter Act and was, consequently, valid. A careful examination of the evidence, however, has convinced us that the proximate cause of the stranding of the Willdomino, from which libelants' original loss resulted, was not unseaworthiness of the ship, but that if the stranding of the vessel resulted from fault such fault lay in negligent navigation or management, as to which the claimant can here derive no relief from the further stipulation in the bill of lading, in that in so far as that stipulation may be in conflict with the third section of the Harter Act it is obviously null and void, and in so far as it is coextensive with or narrower than the Harter Act it is useless, as the third section of the Harter Act is self-executing. Hence claimant's exemption from liability for loss occasioned by negligent navigation or management of the vessel will be considered in connection with claimant's second affirmative defense, in which the third section of the Harter Act is relied upon.

The underlying principles of law applicable to the second affirmative defense have already been considered. The issues of fact arising with respect to that defense are: (a) Was the Willdomino in all respects seaworthy and properly manned, equipped, and supplied; if not (b) had the claimant exercised due diligence to make her so; if the answer to (b) is nay, then (c) did the original damage to libelants' merchandise result from faults or errors in navigation or in the management of the vessel.

[4] The only respect in which the libelants contend that the claimant has failed to establish that the Willdomino was in all respects seaworthy and properly manned, equipped, and supplied, is in the matter of sufficiency of fuel. The time at which the ship must have been seaworthy and properly equipped and supplied or due diligence have been exercised to make her so was at the beginning of her voyage. The Wildcroft, 201 U. S. 378, 386, 26 Sup. Ct. 467, 50 L. Ed. 794; Int. Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 226, 21 Sup. Ct. 591, 45 L. Ed. 830. The voyage from Messina to New York was either an unbroken voyage, or it was a voyage divided into stages. If the former assumption is the correct one, due diligence must have been exercised to have had on board the vessel at the beginning of the voyage a supply of fuel adequate and proper to complete the whole voyage. If, however, the second assumption is the correct one, like diligence must have been

exercised to have had on board at the beginning of each stage of the voyage a supply of fuel adequate and proper to complete the stage of the voyage entered upon. Thin v. Richards & Co. (1892) 2 Q. B. 141, 144; The Vortigern (1899) Prob. 140. The failure to exercise the proper diligence in this respect at the beginning of any stage, whether the damage or loss to cargo resulting from faults or errors in navigation or management of the vessel occurred during that stage or not (see The Ethel, Fed. Cas. No. 4540), would deprive the owner of the exemption conditionally provided by section 3 of the Harter Act, for that section is not satisfied by anything less than due diligence to make the vessel seaworthy and properly supplied and equipped for the whole, and so for each and every stage of the voyage contemplated by the parties and specified in the bill of lading.

[5] Did the claimant meet these requirements, or either of them? The Willdomino left Messina with only 569 tons of coal. That was not sufficient under any circumstances to carry her from Messina to New York. At Gibraltar, a customary coaling port for vessels bound from Mediterranean ports to New York and for which port the vessel sailed from Messina, 400 tons were taken on board. She left Gibraltar for Lisbon with 756 tons in her bunkers. That amount was unquestionably adequate for that stage of the voyage. From Lisbon she cleared direct for New York with but 651 tons. We think this was inadequate. Lisbon is 2,905 miles distant from New York. On the previous eastward voyage from Norfolk to Marseilles, heavily laden, but sailing with the Gulf Stream, and in better than average weather, the daily consumption of coal exceeded, slightly, 42 tons, while the average speed was 7¾ miles per hour. The Gulf Stream added about one-half knot per hour on the east-bound voyage and would lessen to an equal extent the speed on the west-bound voyage. This would make the estimated average speed on the voyage from Lisbon to New York 6¾ miles per hour, but the ship was not so heavily laden. The claimant, however, produced some oral evidence that the average speed for the last three preceding voyages had been 9½ to 9¾ knots per hour with a daily coal consumption of 42 to 43 tons. This was shown to be based on an average speed of 9.1 knots for the preceding voyage from Norfolk to Marseilles, while the logbooks for that voyage, which were in evidence, showed that the average speed was only 7¾ miles. The claimant refused to produce the logbooks for the two preceding voyages. These circumstances left the oral testimony wholly unable to withstand either the inference expressed by the maxim, "Falsus in uno falsus in omnibus," or the presumption that the suppressed logbooks, if produced, would have been unfavorable to claimant's case. Kirby v. Tallmadge, 160 U. S. 379, 16 Sup. Ct. 349, 40 L. Ed. 463; The Bolton Castle, 250 Fed. 403, 162 C. C. A. 473.

Consequently the testimony fixing an average for the three preceding voyages must be ignored. But at Lisbon the vessel had data other than the average speed of the preceding voyage, less the Gulf Stream differential, upon which to estimate the average speed to New York. She had come from Messina to Gibraltar at an average speed of 8.865 miles per hour, and from Gibraltar to Lisbon at 7.35 miles, thus making

the average speed from Messina to Lisbon 8.49 miles. But before the last figure could be used as a basis for estimating the amount of coal necessary to make the ship seaworthy upon leaving Lisbon on a voyage to New York one-half mile would have to be deducted on account of the Gulf Stream. Confronted with the average of 7¾ miles for the preceding voyage, which, owing to the Gulf Stream differential, he could not reasonably hope to exceed even with a more lightly laden vessel, and confronted with the fact that an average of but 7.35 miles had been made from Gibraltar to Lisbon, an estimate for fuel based upon an expected speed exceeding 7¾ miles per hour would not have been justified. That the average speed actually made during the five days intervening between the departure of the vessel from Lisbon and the accident to her machinery was only 7.39 miles is an interesting fact, but it was neither available to the vessel at Lisbon nor needed to indicate the probable average speed on the voyage to New York. At a speed of 7¾ miles it would take 15.618 days for the voyage with a daily coal consumption of at least 42 tons, or an aggregate of 656 tons. Yet she had not that amount in her bunkers when she left Lisbon. Had a speed of 8 miles per hour been used as a basis for the calculations, 635 tons would have been required. The margin of safety between that and the 651 tons with which she left Lisbon was negligible.

To be reasonably fit to make a voyage a ship must have a reasonable margin of safety in her supply of fuel. Experience, as disclosed by the testimony, has shown that for vessels crossing the North Atlantic the proper margin of safety is 20 per cent. to 25 per cent. more than that reasonably expected to be used under normal conditions. It is customary for ships beginning such voyage to carry a fuel supply which provides that margin of safety. Hence, a ship setting out upon such voyage with substantially less than that amount of fuel is, at least in so far as the third section of the Harter Act is concerned, neither seaworthy nor properly equipped and supplied. Upon breaking ground at Lisbon the Willdomino neither had nor approached in its fuel supply the usual and customary margin of safety. Consequently, she was not reasonably fit to carry her cargo throughout the stage of the voyage she then entered upon and was not seaworthy. Int. Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830. It is true that a printed provision of the bill of lading gave to the vessel the liberty "to call at intermediate ports or any port or ports in or out of the customary route in any order to receive and discharge coal," and that another reads thus:

"Eighth. The ship has liberty of filling up and/or bunkering at any port or ports in or out of the way."

These provisions were modified by the following written amendment:

"Filling up only in ports on the way westwards of [to] New York."

The ship's original liberty of calling at "any port or ports in or out of the customary route" to receive coal or of "bunkering at any port or ports in or out of the way" was not affected by the amendment. But we think that neither the bunkering clause nor the fact that there were ports at which she might have called to obtain fuel affects the ques-

tion of her seaworthiness for the voyage she entered upon on leaving Lisbon. The test of seaworthiness is made with respect to the voyage on which a vessel sets out (24 R. C. L. 1328), and, as we have seen, in contemplation of the whole of that voyage. Every voyage must have a terminus a quo and a terminus ad quem. Marsh. Ins. b. 1, c. 7, §§ 1–5. This principle is equally true whether it be considered with respect to insurance or to undertakings between shipowner and shipper. See The Caledonia, 157 U. S. 124, 131, 15 Sup. Ct. 537, 39 L. Ed. 644. That the terminus a quo of the voyage in question was Lisbon is obvious. That the terminus ad quem was New York cannot be made clearer than by quoting from claimant's brief, page 44, where it is said:

"She cleared for New York and both logs indicate that the voyage was from Lisbon to New York."

There is no evidence that there is a port at which it is customary and usual for vessels on a voyage from Lisbon to New York to call for coal. The provisions in the bill of lading authorizing the vessel "to call at intermediate ports or any port or ports in or out of the customary route in any order to receive and discharge coal," and to bunker "at any port or ports in or out of the way," did not release the claimant from its duty to exercise due diligence in making the ship seaworthy in all respects for the definite voyage upon which she sailed. Hurlbut v. Turnure (D. C.) 76 Fed. 587, 590–591, and as affirmed (C. C. A. 2) 81 Fed. 208, 26 C. C. A. 335. We think that notwithstanding the provisions in the bill of lading the Willdomino was unseaworthy upon leaving Lisbon.

When five days out from Lisbon an accident to the machinery, not attributable, as we see it, to any lack of care or diligence, made it necessary to blank off the high-pressure turbine and, propelled by the low-pressure turbine, to put into Ponta Delgada in the Azores for repairs. That port was not equipped to make the needed repairs, and it was decided to complete the voyage on the low-pressure turbine alone. Two hundred and fifty tons of coal were taken aboard and the vessel set out with an aggregate of 629 tons. It was anticipated by the master and chief engineer that she would make 6½ knots per hour and consume 50 tons of fuel per day. The distance from Ponta Delgada to New York is 2,290 miles. At the estimated speed it would take 14⅔ days to complete the voyage and without any allowance for a margin of safety 733 tons of fuel. Five or six days out of Ponta Delgada, it being then manifest that the ship did not have enough coal to take her into New York, her course was changed towards North Sydney, where she arrived with 62 tons of coal on board. Her average speed had been 6¼ miles per hour and her daily coal consumption upwards of 49 tons. The claimant asserts that the insufficiency of the fuel to reach New York was due to unanticipated retarded speed brought about by head winds, currents, and the slip of the propeller. We think the logbooks do not support these contentions. No unusual weather or current conditions are noted. The slip of the propeller had been as great at times before the arrival at Ponta Delgada as it was at times after the departure. Even more enlightening and convincing, however,

is the fact that had the speed been that which the vessel made after leaving Lisbon and before the high-pressure turbine was blanked off, 7.39 miles per hour, for which there could have been no justifiable expectation, the voyage from Ponta Delgada to New York would have required 12.91 days and, so, more than the amount of coal with which the Willdomino left Ponta Delgada. We think that upon leaving that port the vessel was not seaworthy for the voyage to New York.

The acts of the vessel in leaving Gibraltar, Lisbon, and Ponta Delgada with an inadequate supply of fuel is attributable as a matter of law to the owners of the vessel. Int. Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830; British & Marine Ins. Co. v. Kilgour S. S. Co. (D. C.) 184 Fed. 174, 177. It is likewise so attributable in fact. While the Willdomino lay at Gibraltar, the master received from the claimant the following cablegram:

"Your coal requirements excessive cost of bunkers Gibraltar very high make accurate measurement remaining bunkers if not enough to make North Sydney take only enough to reach there cut down consumption in every way if fuel runs short reaching coast cut out one boiler."

As the vessel was not seaworthy when she sailed from Lisbon or from Ponta Delgada, and as the claimant did not exercise due diligence to make her seaworthy before leaving those ports, the conditional exemption provided by section 3 of the Harter Act cannot be availed of if the damage to the cargo occurred through the fault or error in navigation.

[6, 7] The burden of proving that the stranding was due to negligence is upon the shipper. Clark et al. v. Barnwell, 12 How. 279, 13 L. Ed. 985. Though the master was an experienced navigator who had had a sea experience of 23 years, who had held a master's certificate for 12 years, and who was doing at the time of the stranding everything that he thought necessary, yet in view of the evidence we are constrained to conclude that the stranding was due to negligent navigation. The Willdomino left Sydney for Halifax at about 1 o'clock on July 23d. The master had never been over the course from Sydney to Halifax, though he had been from Lewisburg to Halifax and from St. Johns to Halifax. The currents along the coast off which his course lay are treacherous. The coast is very tortuous and rugged and is recognized as a dangerous one. The only bearing obtained after leaving Sydney until the vessel stranded was from Scatari Lighthouse at 5:45 p. m. At 8 p. m. she ran into a thick fog, which continued throughout the night and until after the stranding. After entering the fog, speed was reduced and the whistle blown. The master who was proceeding by dead reckoning, and who believed that the vessel was on her course 20 miles off shore, took no sounding until 4:30 a. m. As that sounding showed 91 fathoms, it confirmed, as the master thought, his judgment as to the position of the vessel, and no more soundings were made. Two hours later the vessel stranded about 7 miles off shore. While there was some suggestion in the evidence that the object struck was a wreck or other uncharted submerged object, a careful examination of the evidence convinces us that there is no room seriously to doubt that the stranding occurred on a charted

reef. We think peculiarly applicable to these circumstances the words of Judge Benedict in The Alpin (D. C.) 23 Fed. 815, 818:

"* * * He [the master] * * * knew, or ought to have known, that he might be under the influence of a current running towards the land. Moreover, the weather was thick, and he knew that he did not know his position, and that an approach to the land would be indicated by the soundings. Under such circumstances common prudence required him to sound. Had he observed this common and, under the circumstances, necessary precaution, the lead would have informed him that he had been mistaken as to his position, and was sailing close to the lee shore; and with this knowledge he could have prevented the accident that shortly occurred."

Other cases to the like effect are The Montana (D. C.) 17 Fed. 377; The City of Para (D. C.) 44 Fed. 689; Union Ins. Co. v. Dexter (D. C.) 52 Fed. 152; The Express (D. C.) 48 Fed. 323. The claimant contends, however, that the master had no reason to doubt that he was on his course particularly after taking a sounding at 4:30 a. m. and finding 91 fathoms, and that consequently he was not negligent in failing to take other prior or subsequent soundings. But one sounding affords little information and, standing alone, may be deceptive. It is only by comparison of successive soundings that the position of the vessel can be ascertained with reasonable certainty. Again, while it is quite true that negligence must be determined upon the facts as they appeared at the time, and not by a judgment from actual consequences which were then not to be apprehended by a prudent and competent man, yet as was said by the Supreme Court in The Germanic, 196 U. S. 589, 596, 25 Sup. Ct. 317, 318 (49 L. Ed. 610):

"* * * It is a mistake to say, as the petitioner does, that if the man on the spot, even an expert, does what his judgment approves, he cannot be found negligent. The standard of conduct, whether left to the jury or laid down by the court, is an external standard, and takes no account of the personal equation of the man concerned. The notion that it 'should be coextensive with the judgment of each individual,' was exploded, if it needed exploding, by Chief Justice Tindal, in Vaughan v. Menlove, 3 Bing. N. C. 468, 475. And since then, at least, there should have been no doubt about the law. Commonwealth v. Pierce, 138 Massachusetts, 165, 176; Pollock, Torts (7th Ed.) 432."

We think that the stranding resulted from the failure to take soundings; that such failure was a fault or error in navigation or in the management of the vessel; and that section 3 of the Harter Act cannot be availed of to exempt the claimant from liability for the damage to libelants' goods occasioned by the stranding.

[8] It was the duty of the carrier to exercise reasonable care, diligence, and activity in preserving from further damage any portion of the cargo that had been damaged by the stranding so far as it could be done consistently with the carrier's duty to the owners of other portions of the cargo. 24 R. C. L. 1306; Harter Act, § 1; Propeller Niagara v. Cordes et al., 21 How. 7, 26, 16 L. Ed. 41. The entire damage to the lime was brought about either by the stranding alone or by the stranding and by subsequent fault or failure properly to care for it. If it was impractical, reasonably, to do anything to protect the lime between July 24th, when the hold in which it was stowed was flooded as a result of the stranding, and October 2d, the date upon which the repairs to the vessel were completed and delivery of the

lime tendered, that is, if there was no negligence, fault, or failure in the proper care or delivery of the lime during that period, the proximate cause of all the damage sustained by it was the negligent navigation of the vessel. If, however, during that period there was a lack of proper care to protect it from continuing and additional damage, such lack of care was the proximate cause of such additional damage. We think there was such lack of care. It is probably true that while the water remained in the hold it was not practical, and that the claimant was not required, to employ divers to remove the casks which had a weight of 1,500 to 1,700 pounds each. It is probably true that the hole torn in the bow of the vessel was of such size and shape that it was not practical, while the vessel remained in the water, to plug, cover, or patch the hole in a way usual with smaller holes. It probably was not practical to exclude the water from the hold by compressed air. But there was another method both practical and reasonable, so far as we can see, by which the lime could have been protected from ever-increasing damage. On August 25th the vessel went into dry dock for an examination for repairs. As the remainder of the vessel's cargo had then been discharged, and as the ship's power and equipment with which the lime had been loaded and stowed at Messina was available for its removal from the hold while the vessel was in the dry dock, it could have been and, as we see it, should then have been, removed from the hold that was open to the sea and placed on deck or in an undamaged hold. It could then have been delivered as soon as the vessel came from the dry dock the first time. Instead, it was permitted to remain, wholly unprotected, in the damaged hold until the repairs to the vessel were completed on October 2d and to be reimmersed in the interim during the periods the vessel was not in the dry dock. In this we think there was lack of proper care. But as the claimant is liable for the entire damage to the goods, whether caused by the negligent navigation or by the subsequent lack of care, or by both, it is unnecessary to ascertain the portion thereof attributable to each cause.

The liability of the claimant is limited to the value of the goods fixed in the bill of lading, $100 per cask, unless that limitation was nullified by an unauthorized deviation of the vessel from her legitimate and contemplated course. Was there deviation? The libelants contend that there was, both in going to Lisbon for cargo and in turning off the course from Ponta Delgada to New York and going to North Sydney for coal. It has been long settled that in every contract of affreightment the carrier by water impliedly undertakes to proceed, without unnecessary deviation, by the direct and usual route to the port of delivery unless authorized by the contract to do otherwise (24 R. C. L. 1336; Constable v. National Steamship Co., 154 U. S. 51, 66, 14 Sup. Ct. 1062, 38 L. Ed. 903), and that any unauthorized deviation of the vessel from her legitimate and contemplated course nullifies exemptions from liability contained in the bill of lading under which the cargo was shipped (The Sarnia [C. C. A.] 278 Fed. 459, 463; The Citta Di Messina [D. C.] 169 Fed. 472, 474–475). The parts of the bills of lading pertinent to the question of deviation are the printed clauses:

"Shipped by, or received for shipment, in apparent good order and condition from Ferd. Baller & Co. to be transported by the good steamship Willdomino, Captain——, to New York with liberty to call at intermediate ports or any port or ports in or out of the customary route in any order to receive and discharge coal, cargo, passengers, and for any other purposes. * * *

"Eighth. The ship has liberty of filling up and or bunkering at any port or ports in or out of the way"

—and the written interpolation, "filling up only in ports on the way westwards of [to] New York."

[9] In so far as they are in conflict the printed provisions must give way to the written. The first question thereby presented is whether Lisbon, where the ship went for cargo only, is a port on the way westward from Messina to New York within the meaning of the written interpolation. But this question was not presented to the trial court and, consequently, will not be considered here. Badger v. Ranlett, 106 U. S. 255, 259, 1 Sup. Ct. 346, 27 L. Ed. 194; H. W. Paine & Co. v. Manistee Tanning Co. (C. C. A.) 279 Fed. 340, 2 R. C. L. 69.

[10] The next question is whether the vessel's putting in at Sydney was authorized by the provisions of the bill of lading or was an unauthorized deviation of the vessel from her legitimate and contemplated course. Though the liberty granted or reserved to the carrier in the matter of bunkering by the bills of lading is broad, it is not unlimited. In Swift & Co. v. Furness, Withy & Co. (D. C.) 87 Fed. 345, the bill of lading recited that "the vessel 'is lying at the port of Boston, and bound for London,' * * * 'with liberty to sail with or without pilots, to make deviation, and to call at any intermediate port or ports for any purpose. * * *'" In considering the word "deviation" so used, the court said:

It "must be held to give to the owner only a limited right of departure from the voyage; and the limits must be those of necessity, and reasonable regard for the rights of both the shipper and carrier, growing out of the nature of the principal contract. * * * This clause refers to the voyage contemplated by the parties, and to deviations reasonably incident thereto, not to an additional voyage arbitrarily made by the order of the owner."

In the Blandon (D. C.) 287 Fed. 722, the voyage was from New York to Valencia, "with the liberty to call at any port or ports in or out of the customary route in any order." The court, in determining whether that clause justified the ship's calling at Philadelphia to take on cargo, said:

"It is said that the clause will allow only reasonable deviations, and this is indeed true, since such a clause is to be construed in its context."

It was there held that though the clause "might not allow a side voyage to Tampico or Galveston," and "would not permit a call at Rio or Montevideo," yet it did justify the ship's putting in at Philadelphia which was "out of the customary route." In the case of The Emelia S. DePerez (D. C.) 287 Fed. 361, affirmed (C. C. A.) 288 Fed. 1019, it was said that "the question is * * * one of degree and reasonable conduct." But the provisions in a bill of lading, at least unless they expressly or by unavoidable implication provide otherwise, obviously relate to and consequently must be construed with

reference to the voyage in contemplation of the shipowner and shipper and must, therefore, be restricted to the business and necessities of the ship pertaining to that voyage. Consequently it has been held that though under the bill of lading the vessel is given liberty "to proceed to and stay at, any ports or places whatsoever (although in a direction contrary to, or out of, or beyond, the route to said port of discharge), once or oftener, in any order, backwards or forwards, for the purpose of receiving and delivering coals, cargo or passengers, or for any other purpose and all such ports, places and sailings shall be deemed within the intended voyage," yet that a stop made at a port near to the route and to be passed in the voyage contemplated but for the purpose of another voyage is not justified by the bill of lading. Austrian Union S. S. Co. v. Calafiore, 194 Fed. 377, 114 C. C. A. 295 (C. C. A. 5); South Atl. S. S. Line v. London-Savannah Naval S. Co., 255 Fed. 306, 166 C. C. A. 476.

[11] In the light of the principles established by the preceding cases, the question of whether or not, under the terms of a bill of lading, a departure from the usual course of the voyage is or is not an authorized and justified deviation, is a question of fact in each case. Pertinent to such question are the customary course between the port of loading and the port of discharge, the usual ports of call, the location of the port in question, the purpose for which the vessel entered that port, and the circumstances under which she entered. Sydney is several hundred miles nearer the Mediterranean ports than is New York. It is not on the usual and customary course. The distance from the Mediterranean ports to New York by way of Sydney is upwards of 300 miles greater than the usual and customary course. Though it is not disputed that the purpose for which the Willdomino went into Sydney was to obtain fuel, yet it is asserted by the libelants that the record discloses that the real purpose was to obtain fuel not solely to complete the voyage to New York but for the succeeding voyage out of New York as well, and that the master, realizing that the open consummation of such a purpose would be a deviation, so contrived as to give the call at Sydney the appearance of a call at a port of refuge. If this contention of the libelants is sound, the putting in to the port of Sydney was an unwarranted and unjustified deviation (Austrian Union S. S. Co. v. Calafiore, supra), without regard to whether or not the vessel was able to consummate its purpose, for it is the purpose of the deviation, and not the consummation of that purpose, that is the test in the matter of deviation. What the real purpose in going to Sydney was cannot be determined by the amount of coal which was there taken on board, for the reason that a strike at that port made it impossible to obtain more than 62 tons, which, with that then remaining on board, 62 tons, was sufficient to take the vessel only to Halifax. Hence the vessel's purpose in going into Sydney is not capable of direct and demonstrative proof, but must be determined upon circumstantial evidence.

That it was the deliberate and continuing purpose not to take on board enough coal to carry the vessel to New York, but only barely enough to carry her to North Sydney, is made certain almost to the point of demonstration by the contents of the cablegram sent by the

owner to the master at Gibraltar and the three consecutive failures at Gibraltar, at Lisbon, and at Ponta Delgada to take on board an adequate and proper amount of fuel for a voyage to New York. Those facts permit no inference other than that it was the intention of the claimant and of the master to have the vessel put in at Sydney. That it was their purpose to conceal this intent and to put in to Syndey as a port of refuge (though under a necessity created by themselves) is shown by the vessel's clearing at Lisbon for New York, the statements of the logbooks that she was proceeding on a voyage to New York, by the subsequent clearance of the vessel at Ponta Delgada for New York and the entries in the engineer's logbook that she was proceeding towards New York, notwithstanding the fact that the vessel did not take on board at Ponta Delgada enough coal to reach New York even had the vessel made, under propulsion by the low-pressure turbine alone, the average rate of speed which she had made during the five days out from Lisbon before the high-pressure turbine was blanked off. That it is unreasonable to ask one to believe that the purpose of this plan and of the stop at Sydney was merely to obtain a proper amount of coal to complete the voyage to New York is shown not only by the preceding facts, but also by the facts that, if there had been acquired at Sydney an amount of coal proper to carry the vessel only to New York, the added cost of the voyage by way of Sydney, notwithstanding the price of coal at that port was much less than at Gibraltar or Ponta Delgada, would have exceeded the cost of the usual voyage on the higher priced coal to have been had at Gibraltar or Ponta Delgada by upwards of $3,600; that if, on the other hand, had the vessel's bunkers been filled at Sydney the net saving on a voyage by way of Sydney over a voyage by the usual route would have been upwards of $8,200; that it was then difficult for foreign vessels to obtain coal at the port of New York, and that the claimant had been obtaining its bunkers at Sydney and Halifax.

The claimant has met this array of convincing circumstantial facts only with the contention that the estimates of coal made at the several ports were made in good faith to carry the vessel to the port of New York, that the master in taking coal aboard was not at all governed by the directions of the owner embodied in the cablegram, that the vessel changed her course towards Sydney only because it had then become demonstrated that the coal then in her bunkers was insufficient to take her into New York, that she put into Sydney merely to obtain the necessary supply for that purpose, and that there is no evidence that it was her purpose there to obtain coal for a subsequent voyage. It is true that there is no direct evidence that it was the purpose to obtain at Sydney coal for a subsequent voyage, but such fact may be established by circumstantial evidence as well as by direct evidence. In fact, motive, intent, and purpose are rarely proved otherwise than by circumstantial evidence. The force of such evidence depends upon the number, tendency, agreement, and conclusive nature of the circumstances adduced to establish a conclusion, and upon whether or not there are inconsistent or opposing circumstances, or whether all the circumstances unite in pointing to but one conclusion. In the present cases the circumstances established are, in our

opinion, susceptible of explanation upon no reasonable hypothesis other than that the existence of the condition which made the stop at Sydney for coal a necessity was deliberately brought about to conceal the true purpose of entering that port, namely, to obtain coal for the succeeding voyage. The departure from the course for such a purpose was an unauthorized and unjustifiable deviation. Moreover, a deviation of a vessel from her legitimate course is not justifiable when induced by the fault of the vessel. 24 R. C. L. 1336. The deviation to Sydney nullified the carrier's limitations of liability embodied in the bills of lading.

[12] We think the claimant is not entitled to recover from Pfizer & Co. the amount of its freight money on the 335 casks. The citrate of lime belonging to that company had an original value of about $179,-000. It was so badly damaged that after being unloaded and abandoned to the ship by the consignee it was sold to the highest bidder for only $3,000. We think the record establishes conclusively that it was no longer in specie. That freight money is not recoverable under such circumstances is well established. Asfar & Co. v. Blundell (1896) 1 Q. B. Div. 123; Duthie v. Hilton, L. R. 4 C. P 138. Scrutton on Charter Parties and Bills of Lading (11th Ed.) pp. 365, 379. The clause in the bill of lading, "Freight on the goods and charges as per margin New York ship lost or not lost," does not, in our view, require the payment of freight for goods so damaged by the carrier's negligence that they cannot be delivered in specie.

The decrees of the court below must be reversed, and the causes remanded, with directions to assess the libelants' damages in the causes instituted against the ship according to the course and practice of courts of admiralty and to dismiss the cross-libel; the libelants to recover costs in this court and in the court below.